[Civ. No. 16504.   Second Dist., Div. Three.   Feb. 25, 1949.]

EL ZARAPE TORTILLA FACTORY, INC. (a Corporation), Respondent, v. PLANT FOOD CORPORATION (a Corporation) et al., Appellants.

Boyle, Bissell & Atwill for Appellants.

Theodore R. Coomber for Respondent.

VALLÉE, J. — Appeal by defendants from a judgment rendered against them in an action brought by plaintiff for breach of an implied warranty of fitness under section 1735, subdivision (1) of the Civil Code in the sale of a carload of corn.

Plaintiff is engaged in the business of manufacturing tortillas. Defendants, Plant Food Corporation and Gordon Williams, its agent, are grain brokers.

Briefly, the complaint alleged: Defendants knowing of the manufacturing business of plaintiff and that plaintiff desired to purchase white corn to be used in the manufacture of "Tortillas," a product for human consumption, on July 25, 1946, sold and delivered to plaintiff 44 tons of white corn; defendants warranted the corn as fit and proper for use in the manufacture of tortillas for human consumption; plaintiff relied upon defendants' warranty; the corn proved to be unfit for the use for which it was represented in that it "contained rodent excreta, insect larvae, was contaminated and adulterated, and unfit for food"; as soon as this unfitness was ascertained, plaintiff notified defendants and offered to return the corn. In their answer defendants denied the foregoing allegations except that they alleged that "on or about July 10, 1946, defendant Plant Food Corporation sold plaintiff one carload of #2 white corn of standard specifications and of Eastern official grades and weights, which said corn at the time of said sale was in transit by rail to Los Angeles, California; that the sale price of the said corn was $5.45 per hundred pounds delivered at Los Angeles; that upon arrival of said corn at Los Angeles the Los Angeles Grain Exchange inspected and graded the said corn and certified it to be #2 white corn according to the official grain standards of the United States," and admitted the offer to return the corn and demand for the return of the purchase price.

The court, among other things, found that: On July 25, 1946, defendants sold plaintiff 44 tons of white corn; plaintiff at the time expressly stated to defendants that the corn "must be good clean corn and fit to be used for human consumption in that it would be made into tortillas"; defendants stated the corn was good clean corn and could be used for that purpose; defendants selected the corn and plaintiff relied upon their skill and judgment; on or about July 29, the 44 tons of white corn, sacked, were delivered at plaintiff's place of business; on September 3, the Department of Health notified plaintiff not to use the corn in that it was suspected of being contaminated; that tests were made of the corn and thereafter it was condemned as unfit for human consumption; on September 19, 1946, plaintiff rescinded the contract, offered the return of the corn to defendants and demanded the return of the purchase price paid therefor; "plaintiff did not purchase the corn by description as #2 grade white corn, but to the contrary, purchased white corn that was to be good, clean and capable of being used for human consumption."

The court concluded that the defendants warranted that the corn would be fit for human consumption; that plaintiff rescinded the contract and was entitled to recover damages.

The facts of the case pertinent to the questions to be considered are:

On July 3, 1946, defendants purchased from Donovan Feed Company of Omaha, Nebraska, two carloads of "#2 white corn or better."

On July 10, 1946, following a telephone conversation between Mario Carranza, plaintiff's general manager and buyer, and defendant Williams, defendant Plant Food Corporation sent the following document to plaintiff:

"7-10-46

"To: M. Carranza c/o El Zarape Tort. Factory
2065 West Jefferson
L.A.

Confirming phone conversation this date between your Mr. C

and our Mr. Wms

we hereby SELL TO YOU
the following:

Quantity   1 carload

Commodity   #2 White Corn

Specifications   Regular

Eastern Grades & wgts

Packing   Bulk

Shipment   In transit to L.A.

Price   5.45 Delvd L.A. Barn

Remarks

This confirmation will be considered correct unless errors or omissions are reported immediately. Please sign and return enclosed card to complete our records.

No. 1594                          Yours very truly,
                          PLANT FOOD CORPORATION
                          [Signed]   Gordon Williams."

Two days later, and on July 12, 1946, defendants received from plaintiff the following writing: "PLANT FOOD CORPORATION We hereby acknowledge receipt of your Confirmation No. 1594 and said confirmation is correct in every particular. [Signed] M. Carranza."

An invoice covering the transaction was also forwarded to plaintiff on July 10th. Omitting descriptive matter not material to the subject matter of the invoice, it is as follows:

"SOLD BY
PLANT FOOD CORP.

. . .

SHIPPED
To Los Angeles

SOLD
To M. Carranza
c/o El Zarape Tortilla Factory
. . . F.O.B. Los Angeles

Terms: Sight Draft —————————

| Units : Pounds | Tons | | Material | Price | Amount | Total |
|---|---|---|---|---|---|---|
| Bulk : 88,000 | : 44 : | | #2 White corn | : 5.45 : | | |
| : | : | : | | : cwt. : | 4,796.00 : | |
| : | : | : | Less Freight | : | : | |
| : | : | : | | : | : | |
| : | : | : | 88,000# @ 60c 528.00 | : | : | |
| : | : | : | Tax 3% 15.84 | : | 543.84 : | |
| : | : | : | | : | : | |
| : | : | : | East. Grds & | : | : | |
| : | : | : | Wghts | : | : | |
| : | : | : | B/L to LAGE | : | : | 4,252.16 |
| Weights final as invoiced | | | | | | |

PLEASE NOTE. No claims will be allowed for short weights, defective goods or on any account, unless reported within ten days of delivery interest at 6% per annum will be charged on all overdue accounts. . . ."

On July 15, 1946, the carload of corn arrived at Los Angeles. It was inspected by a duly licensed grain inspector of the Los Angeles Grain Exchange, who certified the grade of the corn as follows: "Kind and Grade: 2 White Corn. Factors: Wt.perBu. 56.0. Moisture 11.7. Total Damage 4.3. Foreign Material 2.5. Wild Oats ———." This certificate was forwarded to plaintiff, the bill of lading covering the shipment charged to its account, and on July 16th plaintiff paid defendants the sum of $4,252.16, the contract price of the carload of bulk corn.

On July 19, 1946, defendants sent another invoice to plaintiff covering freight costs on the carload of corn, prepaid by defendants, in the sum of $543.84. It contained the additional information that the terms were "net cash on receipt of invoice," and that the shipment had been "Diverted to Garden Grove for your [plaintiff's] acct."

The carload of corn so diverted was sent to the Star Milling Company to be cleaned, recleaned, and sacked. Plaintiff paid the charges for having it done and for the transportation from Garden Grove to its warehouse in Los Angeles.

On July 24, 25, and 26, portions of the corn milled, recleaned and sacked, were delivered by a general trucking company to plaintiff's warehouse; the balance was delivered from the milling company at plaintiff's request to other "users of the same type of business." One of the users took "more than half of the carload"; another took "a hundred sacks." When the balance of the corn was received by plaintiff it was put in its storeroom "and it just laid there until we got rid of it."

On September 6, a food inspector of the Department of Health of the State of California took samples of the milled corn stored in plaintiff's warehouse and on September 13, condemned 37,200 pounds of it as unfit for human consumption.

On September 17, plaintiff notified defendants by letter that it rescinded the sale and offered to return the corn.

Mario Carranza, the sole witness called by plaintiff, testified that some 12 or 14 months prior to the sale of this carload of corn, he had been approached by defendant Williams, representing the defendant Plant Food Corporation; "He asked me if I was in the market for corn. I told him that I was. He asked me what corn we wanted or how we wanted it, and I told him we wanted nothing but the best grade of white cleaned, recleaned corn, sacked, that it had to be used for human consumption, for food purposes. . . . He said he didn't have any immediately but he would look for some for us. And eventually, it wasn't very long after that, that he told us he could get that corn for us." Thereafter, at different times, plaintiff purchased from defendants several carloads of corn which were delivered cleaned, recleaned, and "sacked" to plaintiff's place of business. About three months prior to the sale in question Williams again contacted him regarding orders for corn and was told plaintiff would require some within the next two or three months. "Some few days prior

to this sale he called me and told me he had a car of corn; did I want it? I asked him if it was the corn that we customarily used, that we bought from him before, the same grade; the same kind. I am always careful to specify that it is for . . . I always asked him to give us white, cleaned and recleaned, sacked corn. Q. What did he say to you? A. He said he had such corn for us, that he could get that corn for us. THE COURT: Cleaned corn, sacked? A. Cleaned, recleaned and sacked, white corn.'' Carranza further testified that no particular grade of corn was necessary for plaintiff's use; that it could be No. 1, No. 2, or No. 3 grade; that he so informed Williams; that the ''main thing is that it should be white, clean, free of all contamination, fit for tortillas, making of food products''; that it was understood that Williams would ''arrange for us to have it cleaned and recleaned, and sacked. He made all the arrangements as to who should do the job; when the job was done they billed us for it''; that he had no personal contact with the Star Milling Company.

Defendant Williams testified that on the occasions prior to the sale of the corn involved the ''basis'' of the contract between the parties ''would be that we would supply a car of No. 2 white corn or better''; that on the prior occasions when the corn was delivered ''sacked'' to plaintiff, ''we would buy it that way. . . . It was bought from people that were in the business of doing the job of furnishing the grade of corn required, which was No. 2 or better, and were set up to do the job of recleaning and sacking, loading it in the car and transporting it to us out here. And we in turn would then have it delivered to Mr. Carranza.'' With respect to the sale of the carload of corn in question, he testified he telephoned Carranza; that Carranza had asked him to call whenever No. 2 white corn would be available; ''I told him I had a car that was available; it was then in transit. It was a car of No. 2 white corn, it was then in transit to Los Angeles. It was a bulk car, he would have to make the necessary arrangements about recleaning and sacking, because this particular car of corn was not recleaned and sacked in the east. . . . He said he would take the car of corn, and make the necessary arrangements about recleaning and sacking it. Q. BY MR. BOYLE. What actually happened, did he make arrangements or did you make arrangements? A. He tried to I believe, and contacted one of the mills here and they were very busy, and couldn't do it and he asked me if I

could do anything to help him out. I said I would try. I contacted the Star Milling Company down at Garden Grove, talked to the manager there. He said that he would do the job of recleaning and sacking it at a certain charge, which it was—I don't remember the exact charge that was mentioned. That information I passed on to Mr. Carranza and asked him for further instructions. He said after the car got here to arrange to send it down to the Star Milling Company, Garden Grove, to have it recleaned and sacked. . . . The car came in to Los Angeles, was inspected again to make sure it was No. 2 white corn, double checked. It was found to have been that and it was then diverted down to the Star Milling Company at Garden Grove to carry out Mr. Carranza's instructions of recleaning and sacking the corn. Q. Did you have anything more to do with the corn after it left Los Angeles? A. Nothing more. Q. All charges were to be sent on to Mr. Carranza? A. He arranged for the pickup when it was recleaned and sacked.''

The principal question involved on this appeal is whether the evidence is sufficient to warrant a conclusion of the breach of any warranty on the part of the defendants in the sale of the carload of corn.

Defendants objected to Carranza's testimony to the effect that at the time of the purchase of the carload of corn in bulk it was agreed that the corn was to be cleaned, recleaned and sacked and fit for food products before delivery to the plaintiff, on the ground that it was an attempt by parol to vary the terms of the written contract, but the trial court admitted the evidence on the theory that the written confirmation of the sale and plaintiff's written acknowledgment thereof were but evidence of the contract between the parties.

Plaintiff's cause of action, the findings of the trial court and the judgment rest upon this parol testimony alone, and if, as contended by appellants, it was error to admit it, the findings are without support and the judgment resting thereon must fall. Appellants' contention is well taken.

The documents exchanged by the parties constituted a complete contract of sale. Together, they contain all of the essential elements of a completed contract: the parties, the subject matter of the sale, the purchase price, and shipping details. Defendants agreed to sell. Plaintiff agreed to buy. (*Tuso* v. *Green*, 194 Cal. 574, 580-581 [229 P. 327]; *Ring* v. *California Mortgage Co.*, 16 Cal.App.2d 14, 15 [60 P.2d 143]; *Pray* v. *Trower Lumber Co.*, 101 Cal.App. 482, 485 [281 P.

1036].)  ██  The contract is silent as to any duty on the part of the defendants to clean, reclean and sack the corn before delivery to plaintiff. This omission is fatal to plaintiff's cause of action.

The principle is stated in *Calpetro P. Syndicate* v. *C. M. Woods Co.*, 206 Cal. 246, 251 [274 P. 65], quoting from 2 Mechem on Sales, section 1254: " 'The rule is well settled that where the parties have reduced to writing what appears to be a complete and certain agreement, importing a legal obligation, it will, in the absence of fraud, accident or mistake, be conclusively presumed that the writing contains the whole of the agreement between the parties, the parol evidence of prior, contemporaneous or subsequent conversations, representations or statements will not be received for the purpose of adding to or varying the written instrument. If, therefore, such a writing exists between the parties, and it contains no warranty at all, no warranty can be added by parol; if it contains a warranty of some kind or to some extent, parol evidence will not be admitted to extend, enlarge or modify that which the writing specifies.' " (To the same effect: *Nimmo* v. *Fitzgerald,* 202 Cal. 565, 569 [261 P. 1015] ; *Kullman, Salz & Co.* v. *Sugar etc. Co.*, 153 Cal. 725, 731 [96 P. 369] ; *Germain Fruit Co.* v. *Armsby Co.*, 153 Cal. 585, 593 [96 P. 319] ; *Merchants Finance Co.* v. *Acosta Bros.*, 82 Cal.App. 431, 433 [255 P. 772] ; *American Steel Pipe etc. Co.* v. *Hubbard,* 42 Cal.App. 520, 523 [183 P. 830] ; *Monahan* v. *Watson,* 61 Cal. App. 417, 421 [214 P. 1001] ; Civ. Code, § 1625.) Neither mistake nor fraud is claimed. The validity of the contract is not in dispute. No ambiguity appears in the contract. It must, therefore, be considered as containing all of the terms agreed upon by the parties, and there can be no evidence of the terms agreed to other than the contents of the writing. (Code Civ. Proc., § 1856.) The ultimate effect of Carranza's testimony is to add by parol an additional term not embodied in the written contract.  ██  The parol evidence rule is not a rule of evidence. It is one of substantive law. If evidence of conversations and negotiations preceding or contemporaneous to the execution of the writing is admitted it must be ignored. It has no legal force. (*Estate of Gaines,* 15 Cal.2d 255, 264-265 [100 P.2d 1055] ; *Pacific States Securities Co.* v. *Steiner,* 192 Cal. 376 [220 P. 304] ; *Nourse* v. *Kovacevich,* 42 Cal.App.2d 769, 771 [109 P. 2d 999] ; *O'Melia* v. *Adkins,* 73 Cal.App.2d 143, 148 [166 P.2d 298] ; *Lifton* v. *Harshman,* 80 Cal.App.2d 422, 432 [182 P.2d 222].)

Appellants contend that under the written contract the term "No. 2 white corn" amounts to an express warranty of quality; that the term has a definite and well-known meaning in the trade; and that where, as here, there was delivery "F.O.B., Los Angeles" to plaintiff of a carload of "No. 2 white corn" the assurance of quality warranted by the terms of their written contract was fulfilled. Plaintiff stipulated at the trial that the carload of corn was No. 2 white corn "or better."

■ No particular words are necessary to create a warranty. "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. . . ." (Civ. Code, § 1732.) The omission of the word "warrant" in the written contract is immaterial. (*Chamberlain Co.* v. *Allis-Chalmers Co.*, 51 Cal.App.2d 520, 522 [125 P.2d 113].)

■ Where the terms of an agreement designate the particular quality of a commodity to be delivered in phrases which are well known in the trade of the particular commodity purchased and sold, such description and designation amounts to an express warranty. (*Brandenstein* v. *Jackling*, 99 Cal.App. 438, 446 [278 P. 880] [where the term "No. 1 rice" was held an express warranty]; *Barrios* v. *Pacific States Trading Co.*, 41 Cal.App. 637, 639 [183 P. 236] [where the term "export-cured codfish" amounted to an express warranty]; *Firth* v. *Richter*, 49 Cal.App. 545 [196 P. 277] [where the term "Valencia orange trees" was held to be an express warranty]; *Porter* v. *Gestri*, 77 Cal.App. 578 [247 P. 247] [where the term "dried black grapes" was held to be an express warranty that the grapes were of the black variety]. (*Cf., Miller* v. *Germain Seed etc. Co.*, 193 Cal. 62, 66 [222 P. 817, 32 A.L.R. 1215]; *Polhemus* v. *Heiman*, 45 Cal. 573, 578; 24 R.C.L. § 445, p. 171; 22 Cal.Jur. § 69, p. 994.) The rule that a sale of goods by a descriptive name well known in the trade amounts to an express warranty simply holds the seller to deliver the goods which he has contracted to deliver. (*Brandenstein* v. *Jackling*, 99 Cal.App. 438, 446 [278 P. 880].)

The evidence is without conflict that: the term "No. 2 white corn" has a definite meaning in the general usages and customs of the grain trade; that before being graded as such it must comply with certain regulations and specifications

laid down by the Department of Agriculture; when so graded it does not mean it is fit for human consumption; before corn in bulk can be used for human consumption it requires the additional process of cleaning, recleaning and milling; there is a general custom on the part of grain dealers not to warrant corn as fit for human consumption when sold according to the term "No. 2 white corn." ▪ We take judicial notice that the official grain standards of the United States Department of Agriculture prescribe the following standard for No. 2 grade corn:
"

| | | | | Maximum limits of — | |
| | Minimum test | | Cracked corn | Damaged kernels | |
| Grade No. | weight per bushel | Moisture | and foreign material | Total | Heat Damaged |
| --- | --- | --- | --- | --- | --- |
| Pounds | Percent | Percent | Percent | Percent | Percent |
| . . . | . . . | . . . | . . . | . . . | . . . |
| 2 | 53 | 15.5 | 3 | 5 | .2 |
| . . . | . . . | . . . | . . . | . . . | . . . |
| | | | | | " |

The inspection made of the corn on July 15 shows that upon delivery to plaintiff the corn came well within this standard.

▪ Defendants performed all of the terms of their agreement to deliver the carload of bulk "No. 2 white corn" to plaintiff, f.o.b. Los Angeles, when it arrived in Los Angeles, was graded and certified as being such, and the bill of lading charged to plaintiff's account. (Civ. Code, §§ 1738, 1739.)

▪ Civil Code, section 1735, subdivision 1, relied upon by respondent, is not applicable. Section 1735, in part, provides: "Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows: (1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose. . . . (6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith." Any implied warranty "that the goods shall be reasonably fit" for human consumption, which may be said to have

arisen by operation of this subdivision because of the testimony of Carranza, is inconsistent with the express warranty contained in the written contract. The contract warrants that the corn shall be "#2 white corn—bulk." Number 2 white corn in bulk is not fit for human consumption. An express warranty negatives an implied warranty which is inconsistent therewith. (*United Iron Wks.* v. *Outer H. etc. Co.*, 168 Cal. 81, 85 [141 P. 917]; *Sutter* v. *Associated Seed Growers, Inc.*, 31 Cal.App.2d 543, 547 [88 P.2d 144].)

We may observe that there is no evidence that the corn was not fit for human consumption when delivered to plaintiff by the milling company on July 24, 25 and 26, which was after it had been cleaned, recleaned and milled. Plaintiff had possession of the corn thereafter. It is a highly perishable commodity. The record is also devoid of any evidence that at any time thereafter and prior to September 6, 1946, the corn was not fit for human consumption. Therefore, if it should be assumed that there was an implied warranty, as respondent claims, there is no evidence of a breach of such warranty by appellants. The first occasion upon which it may be said that it was not fit for human consumption was September 6, 1946. The evidence is insufficient to sustain a finding that the corn at the time it was delivered to respondent was in the same condition as it was on September 6, 1946. The burden was on respondent to prove that the corn did not conform to the contract at the time of the sale. Because of the lack of such evidence, the judgment cannot be sustained. (22 Cal.Jur. § 59, p. 983; *Riessen* v. *Pusateri*, 229 App.Div. 432 [242 N.Y.S. 346]; 4 Williston on Contracts (rev. ed.) § 996B, p. 2750.)

Judgment reversed.

Shinn, P. J., and Wood, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 25, 1949. Carter, J., and Schauer, J., voted for a hearing.