## No. 17,837.

### VANADIUM CORPORATION OF AMERICA *v.* WESCO STORES COMPANY, ET AL.

(308 P. [2d] 1011)

Decided March 18, 1957.    Rehearing denied April 8, 1957.

Messrs. HOLLAND & HART, Mr. ROBERT P. DAVISON, for plaintiff in error.

Mr. GEORGE V. KEMPF, for defendant in error Wesco Stores Company.

Messrs. HUGHES & BJELLAND, for defendant in error Andy Voytilla.

· *In Department.*

MR. JUSTICE HALL delivered the opinion of the Court.

THIS action was brought by Wesco Stores Company, plaintiff in the trial court, (herein referred to as Wesco), against Voytilla (defendant in the trial court and defendant in error here) to recover the sum of $2,942.83, being the agreed price of 271 dressed turkeys sold by Wesco to Voytilla, which turkeys were, pursuant to orders from Voytilla, delivered by Wesco to Vanadium Corporation of America (herein referred to as Vanadium, third party defendant in the trial court and plaintiff in error here). Voytilla filed his third party complaint against Vanadium to recover the sum of $3,079.07, being the price which Vanadium agreed to pay to Voytilla for the same 271 turkeys.

In answer to Wesco's complaint, Voytilla admitted the purchase of the turkeys from Wesco but alleged that the turkeys delivered were decomposed and unfit for human consumption, whereas his purchase agreement with Wesco called for delivery of turkeys in first class condition.

Vanadium in answer to Voytilla's third party complaint admits that it contracted with Voytilla for the purchase of a quantity of turkeys for Christmas gifts for its employees but alleges that the 271 turkeys tendered to it at Durango were spoiled and unfit for human consumption because of careless and improper preparation and shipment by Voytilla.

The evidence is not in dispute. About December 1, 1952, Vanadium contacted Voytilla seeking to purchase 400 dressed turkeys, each weighing about 20 pounds, at the price of 56½c per pound delivered at Naturita and Durango, Colorado, delivery to be on or about December 18th. Voytilla promptly contacted Wesco and offered 54c per pound for the turkeys needed; Wesco promptly contacted Sumner Hatchery and agreed to purchase the required turkeys from that firm for 52c per pound, the same to be eviscerated, packed in vacuum bags and delivered *unfrozen* to Wesco at Uncompahgre, Colorado. Wesco then agreed to sell and deliver the 400 turkeys to Voytilla at Nucla, Colorado. Wesco had no facilities for freezing the turkeys, Voytilla had such facilities. Voytilla then accepted the order of Vanadium. There was no agreement between Voytilla and Vanadium as to whether the turkeys should be frozen or unfrozen.

On December 10, 1952, Sumner delivered to Wesco 137 unfrozen turkeys, dressed and packed in vacuum bags. On December 11, 1952, these 137 unfrozen turkeys were delivered by Wesco to Voytilla at Nucla; Voytilla immediately froze the turkeys and they were delivered to Vanadium at Naturita for distribution to its employees. These 137 turkeys were accepted and paid for without complaint.

During the evenings of December 11th and 12th Sumner delivered an additional 271 turkeys to Wesco. These turkeys had been processed by Sumner on the 11th and 12th in the same manner as had the 137 turkeys delivered by Sumner to Wesco on the 10th. Sumner instructed Wesco that these turkeys should be "quick

frozen" immediately. Wesco placed the 271 turkeys in an unrefrigerated warehouse where they remained until packed in boxes and placed in a cooler; the last of them being boxed and placed in the cooler on the 14th. Wesco did not freeze these turkeys, and pursuant to instructions from Voytilla delivered the turkeys to The Durango Ice and Produce Company at about 9:00 o'clock P.M. December 15th. It is admitted that Durango Ice and Produce Co. acted as agent for Vanadium in receiving, caring for and distributing the turkeys. In making this delivery Wesco had the turkeys loaded on one of its insulated trucks about noon of the 15th. At the time the boxes were put in the truck the outside temperature was above freezing, the truck was partially loaded with potatoes and was equipped with a heater to prevent freezing. The evidence is uncontradicted that the heater was not used on the trip to Durango. The temperature in the area covered by the truck on the 15th was a high of 45° and a low of 18°.

On delivery of the turkeys at Durango, The Durango Ice and Produce Co. placed them in an unheated hallway where they remained from about 9:00 P.M. of December 15th until about 10:00 A.M. of the 16th — during this period the outside temperature was about 20° and the temperature in the hallway between 20° and 30°. At about 10:00 A.M. on December 16th The Durango Ice and Produce Co., pursuant to orders from Vanadium, placed the turkeys in its freezer room for freezing. The temperature in this room was from zero to 5° below, the boxes were stacked high on dollies; were not opened and later the same day were re-arranged and staggered so the cold air could circulate around them. Some of the turkeys were never frozen inside. On December 20th distribution of the turkeys to Vanadium employees was started. Upon opening the bags it was then discovered that the turkeys were spoiled, unfit for human consumption, and on orders of The Colorado Department of Agriculture were destroyed.

The evidence shows that proper procedure for processing and preserving turkeys calls for removal of all body heat promptly after killing, evisceration, placing in a vacuum bag to prevent discoloration and dehydration, keeping in a cooler at a temperature below 35°. So cared for, the turkeys should keep for at least ten days. An alternate proper procedure calls for "sharp" or "quick" freezing immediately following removal of all body heat, evisceration and packaging as outlined above. "Sharp" or "quick" freezing is best accomplished by placing the birds in a cooler at a temperature of 25° to 30° below zero until frozen solid, thereafter to be kept at temperatures below freezing. Turkeys so handled keep indefinitely and are not subject to spoilage until lapse of a reasonable time after thawing.

Trial was to the court. The court found the issues in favor of Wesco and against Voytilla and entered judgment in favor of Wesco for $2,942.83. The court also found the issues on Voytilla's third party complaint in favor of Voytilla and against Vanadium and entered judgment in favor of Voytilla against Vanadium for $2,942.83. There is presented to this court for review only the question of the correctness of the judgment of Voytilla against Vanadium.

The contract of purchase and sale entered into by Voytilla and Vanadium does not specify whether the turkeys should be frozen or unfrozen. Time for delivery was not definitely fixed, and though it would appear that the parties probably intended delivery on the 18th, Vanadium did not in any manner protest the delivery on the 15th.

The evidence is uncertain, inconclusive and leaves much to be desired in determining the difficult question of fact involved. One thing is certain; the turkeys were spoiled five days after delivery to The Durango Ice and Produce Company, which Company was the agent of Vanadium. One or more persons failed in properly processing or preserving the turkeys.

(a) Possibly the Sumner Hatchery may not have gotten all of the body heat out of the birds and that may have caused the spoilage. The evidence disclosed by this record is to the contrary.

(b) Wesco may have failed in not, at all times after receipt of the turkeys until delivered at Durango, keeping the turkeys at temperatures low enough to prevent spoilage. The evidence on this question is unsatisfactory and inconclusive, however we feel it sufficient to warrant the trial court's finding that:

"There was no evidence produced which showed improper handling of the turkeys until they were delivered to third party defendant's agent at Durango, The Durango Ice and Produce Company, on Monday, December 15, 1952."

(c) Durango Ice and Produce Co. may have done the wrong thing in partially freezing these turkeys after others had proceeded for five days on the theory that they were not to be frozen. There is nothing in the record to indicate that Durango Ice and Produce Co. followed proper procedure in handling turkeys that had not been frozen, by partially freezing the turkeys.

All parties were aware of the fact that Vanadium expected to receive turkeys that would be edible on Christmas day and it is conceded that on such sale there was an implied warranty that the turkeys would be suitable for human consumption.

Counsel for Vanadium urge two main points for reversal. 1. That there was a breach of the implied warranty of suitability of the goods, and 2. The admission of incompetent evidence.

■ 1. By Vanadium's direction the turkeys were delivered to Durango Ice and Produce Co., and it is claimed that this amounted to an acceptance. Our statute, C.R.S. '53, 121-1-48, provides:

"What constitutes acceptance. — The buyer is deemed to have accepted the goods when he intimates to the seller that he has accepted them, or when the goods have

been delivered to him, and he does any act in relation to them which is inconsistent with the ownership of the seller, or when, after the lapse of a reasonable time, he retains the goods without intimating to the seller that he has rejected them."

Vanadium, having taken physical possession and control of the turkeys, partially frozen them and retained them for five days, is presumed to have accepted them.

■ Having accepted the turkeys and now seeking to avoid payment therefor because of breach of the implied warranty of suitability for human consumption, Vanadium is charged with the burden of proving unsuitability at the time of delivery and acceptance.

"The burden is on the buyer seeking to recover damages for defects in quality, or setting up such defects as an affirmative defense in an action for the price, to prove that the defects existed at the time of sale and did not result from deterioration after shipment, or from the buyer's negligence after he came into possession of the property, since there is no presumption that the defects discovered after delivery existed at the time of sale." 77 C.J.S. P. 921, Sec. 204.

The following language from a California decision is applicable to the situation presented by this record:

"We may observe that there is no evidence that the corn was not fit for human consumption when delivered to plaintiff by the milling company on July 24, 25 and 26, which was after it had been cleaned, recleaned and milled. Plaintiff had possession of the corn thereafter. It is a highly perishable commodity. The record is also devoid of any evidence that at any time thereafter and prior to September 6, 1946, the corn was not fit for human consumption. Therefore, if it should be assumed that there was an implied warranty, as respondent claims, there is no evidence of a breach of such warranty by appellants. The first occasion upon which it may be said that it was not fit for human consumption was September 6, 1946. The evidence is insufficient to sustain a

finding that the corn at the time it was delivered to respondent was in the same condition as it was on September 6, 1946. The burden was on respondent to prove that the corn did not conform to the contract at the time of the sale. Because of the lack of such evidence, the judgment cannot be sustained." *El Zarape Tortilla Factory, Inc. v. Plant Food Corporation et al.*, 90 Cal. App. (2d) 336, 203 P. (2d) 13.

■ Counsel for Vanadium contend that proof of the spoiled condition of the turkeys four and one-half days after delivery and acceptance was sufficient to prove the turkeys were in a defective condition when delivered, and in support thereof refer to several cases in which it has been held that the fact that canned or bottled goods on opening, by a buyer, are defective is some evidence that they were defective when delivered to buyer. These cases are not persuasive in the circumstances before us. Here there was evidence of questionable handling of the turkeys by Vanadium or its agent for a period of four and one-half days before opening of the bags. The trial judge determined the facts and concluded from all of the evidence that Vanadium had not met the burden of proving the turkeys were defective at the time of delivery. This finding is sufficiently supported by the evidence and will not be disturbed.

■ 2. Vanadium during the trial objected to (a) all evidence concerning the manner of handling the turkeys that were delivered to Nucla and accepted by Vanadium, (b) all evidence concerning the Colorado Refrigerated Locker Law and regulations issued as to how the turkeys should have been handled at Durango. Had the trial been to a jury, these objections might have some merit, but where trial is to the court it is presumed that all incompetent evidence was disregarded by the trial judge and a judgment will not be reversed because of the admission of such evidence, there being sufficient competent evidence in the record to support the judgment. We need not pass on the admissibility of the

questioned evidence, there being other evidence in the record sufficient to sustain the court's findings. In such circumstances the admission of the questioned evidence is not ground for reversal.

"Whatever error was committed in this regard cannot operate to reverse the judgment. The note was wholly unnecessary to the maintenance of the plaintiff's cause of action. This was sustained otherwise by sufficient competent testimony. It was clearly proven that Miller and Matthews & Company entered into an agreement concerning the shipment and purchase of the ore. The money sued for was shown to have been advanced by Matthews & Company. Markell adopted the agreement, accepted its benefits and promised upon a sufficient consideration to repay the money. Since there was sufficient competent testimony to support the finding and judgment of the court, and the case was tried without the intervention of a jury, there cannot be a reversal because the court erred in permitting to be brought to its attention incompetent evidence. It will be assumed that this did not influence its conclusion." *Markell v. Matthews,* 3 Colo. App. 49, 32 Pac. 176.

To the same effect see *Bartleson v. Clark,* 8 Colo. App. 234, 45 Pac. 509; *Crocker v. Burns,* 13 Colo. App. 54, 56 Pac. 199.

Counsel for Voytilla in their answer brief contend that Voytilla is entitled to interest on the amount of the judgment from the date of delivery of the turkeys. This matter was never presented to the trial court and no motion to alter or amend the judgment was ever filed in the trial court. Rule 59 (e), R.C.P. Colo., requires that a motion to alter or amend must be filed within ten days after entry of judgment. Rule 6 (b), R.C.P. Colo., divests the court of jurisdiction to extend the time for taking action under Rule 59 (e). It is now too late to seek or obtain modification of the judgment entered August 25, 1955. *Clark v. Hicks,* 127 Colo. 25, 252 P. (2d)

1067; *Green v. Hoffman,* 126 Colo. 104, 251 P. (2d) 933. The judgment is affirmed.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE HOLLAND, and MR. JUSTICE FRANTZ concurring.