[Civ. No. 21012. First Dist., Div. Two. Oct. 21, 1963.]

WALTER M. CALLISON, Individually and as Guardian, etc., et al., Plaintiffs and Appellants v. CONTINENTAL CASUALTY COMPANY, Defendant and Respondent.

Neil Cunningham for Plaintiffs and Appellants.

Carroll, Davis, Burdick & McDonough and Gilbert Eisenberg for Defendant and Respondent.

AGEE, J.— Defendant insurance company issued a health and accident policy to plaintiff Walter M. Callison, effective February 5, 1958, which policy also covered his son, plaintiff Russell Callison, aged 6 years. It provided for payment of expenses incurred while "necessarily confined in a hospital . . . as the result of injury or sickness."

On March 21, 1960, the boy was severely burned in a fire and was hospitalized for over four months thereafter. The policy provided for a maximum aggregate liability of $5,000, less the deductible amount of $300, for "any one accident or any one period of sickness." The expenses incurred during the first hospitalization exceeded $5,000. Defendant paid this amount in full, less the $300 deductible.

Over six months after the termination of the first period of hospitalization, during which interval no expense covered by the policy was incurred, the boy re-entered the hospital and "there underwent medical treatment and plastic surgery for the removal of scars, [and] adhesions, which developed as the result of said burns. . . ."[1]

Expenses of $1,955.69 were thereby incurred and plaintiffs filed this action to recover such amount less the $300 deductible. The total benefits payable under the policy for an *injury* having been paid in full, the only basis for obtaining any further recovery would have to be upon the theory that the boy's disability was caused by *sickness* and that the second hospitalization constituted a new period of sickness.

Following a nonjury trial, judgment was rendered in favor of defendant and plaintiffs have appealed therefrom.

If the disability is held to be a sickness, as distinguished from an injury, then the following provision in the policy becomes available to appellants: "If, following a period for which expense is payable under this policy by reason of any one period of sickness, no expense covered by this policy is incurred as a result of such sickness for a period of six consecutive months but thereafter expenses are incurred from the same cause, such expense so incurred shall be deemed to be the result of a different sickness and compensable as a new period of sickness, subject to a new Deductible Amount."

This provision has no application to an "injury" or "accident." It binds the insurer to treat a second period of sickness as compensable if the required interval of six months

---

[1]This quote is from the "Stipulation of Facts" entered into by respective counsel and is included in the record on appeal.

occurs. Its obvious purpose is to eliminate any controversy between the parties as to whether such second period is the result of a new sickness or merely a recurrence of the previous sickness.

In interpreting the policy, we must be guided by the fundamental rule that any ambiguity or uncertainty therein will be construed in favor of the insured and against the insurer. (*Continental Cas. Co.* v. *Phoenix Construction Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914]; *Arenson* v. *National Auto. & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 83 [286 P.2d 816].)

However, "[w]hile uncertainties and ambiguities in insurance policies are to be resolved against the insurer [citation], this does not mean that courts are authorized to put a strained and unnatural construction on the terms of a policy in order to create an uncertainty or ambiguity." (*McMillan* v. *State Farm Ins. Co.* (1962) 211 Cal.App.2d 58, 62-63 [27 Cal.Rptr. 125].)

*Is the policy ambiguous or uncertain?* The policy starts with the general provision that respondent insures appellants for loss "resulting from injury or sickness," to the extent therein provided.

The other pertinent provisions are as follows: " 'Injury' wherever used in this policy means *bodily injury* caused by an *accident*. . . . 'Sickness' wherever used in this policy means *sickness or disease* contracted after this policy has been in force for not less than thirty days after its effective date . . ." (italics ours). (A compensable "injury" may occur at any time after the effective date.)

"Termination of this policy . . . shall not reduce or end any liability with respect to care or treatment of sickness contracted prior to the termination of this policy or injury occurring prior thereto . . . .

"Indemnity will be paid . . . only for expenses . . . incurred within two years after the date of the accident or within two years after the commencement of the first hospital confinement resulting from the sickness which is the basis of claim. . . . In no event will payment be made in excess of the applicable Aggregate Amount Payable . . . as the result of any one accident or any one period of sickness . . . .

[Then follows the so-called six months' provision, quoted above, which relates to what will be construed to be a "new period of sickness."]

"When as the result of injury or sickness . . . the Company

will pay, ... [then follows a list of compensable items and the amounts payable for each]."

It is significant that the terms, "sickness," "illness" and "disease" are used interchangeably with each of the others and with the intent to describe but one separate and distinct condition constituting a disability which is compensable under the policy. It is equally clear that the terms "injury" and "accident" are used interchangeably to describe another distinct kind or type of disability which is compensable under the policy.

This contradistinction between "injury" and "sickness" is maintained throughout the entire policy. When *both* of these terms are used in the same contract or document, the distinction is more evident. When both are not so used, some uncertainty may result under certain circumstances.

This is illustrated in *Doody* v. *Davie* (1926) 77 Cal.App. 310 [246 P. 339], which is relied upon strongly by appellants. There a city fireman was incapacitated from performing his duties for a period of nine days by reason of a sore foot, which condition was caused by stepping on a nail while at home on his " 'day off.' " His employer, the City of Oakland, refused to pay him for these nine days.

Section 100 of the city charter provided that, upon "becoming incapacitated for duty by reason of sickness [a fireman] shall be entitled to sixty days' sick leave without loss of pay." The fireman contended that his absence from work came under this "sick leave" provision.

Section 100 1/2 of the city charter provided that, in case of injury sustained while in the performance of duty, a fireman shall receive, in addition to the sick leave provided for by section 100, medical treatment and full pay during the continuance of such disability.

Appellants, who were members of the city council, argued that section 100 1/2 intended to exclude by implication any intention to provide for payment of salary during a period of disability caused by injuries received outside of the course of employment.

The court rejected this argument, stating as follows: " [I]t seems to us more logical to conclude that since, in the case of injuries occurring during the course of the employment, a fireman, in addition to his 'sick leave' or payment of salary during disability, was allowed, by section 100 1/2 of the charter, medical, surgical, and hospital treatment, ... this section [100 1/2] created a difference between injuries in the

course of performance of duty and those sustained at another time, and that in the latter .case, the fireman was merely entitled to the usual sick leave provided for in section 100 of the charter.'' (P. 312.)

Thus, because section 100 contained the only provision in the charter relating to disability benefits for an employee who became incapacitated while outside of the scope of his employment and because this provision used only the word ''sickness'' to describe such incapacity, the court felt that it was the intention of the charter to include injury as well as sickness under the term ''sickness.''

The court recognized that this broad interpretation of sickness should be confined to the particular provisions of the charter under consideration. In the concluding sentence of its opinion, the court states: ''There are no authorities directly in point upon this question, but this court agrees with the trial court that the injury suffered by petitioner constitutes a 'sickness' *within the meaning of section 100 of the Oakland city charter.*'' (Italics ours.)

The appellants in *Doody* v. *Davie* also called attention to ''the improvident and unusual result of paying men for services which they are unable to perform because of injuries suffered while about their own concerns on a day when they are relieved from duty.'' The court answers this argument as follows: ''We can only suggest that if this was not the intention of those responsible for the charter, it would be well to have it amended so as to remove the question from the *realm of doubt.*'' (Italics ours.)

In other words, the court found a lack of clearness or certainty in the charter provisions relating to the question then before it and resolved such uncertainty in favor of the injured employee. This is in line with the policy of the workmen's compensation cases (cf. ''Workmen's Compensation,'' 55 Cal.Jur.2d § 4, p. 16; ''Policy; Purpose; Theory'').

Appellants also cite and rely upon *Murray Hospital* v. *Angrove,* 92 Mont. 101 [10 P.2d 577]. Montana has a Workmen's Compensation Act which permits employers and their employees to enter into a contract with a hospital providing for hospital care (1) for *injuries* received in and arising out of the course of the employment and (2) for *sickness,* except venereal diseases and alcoholism.

The employee was struck by an automobile while on his way to work and it was held that he was not entitled to care under (1) but was entitled to such care under (2).

The basis of the court's holding is as follows: ''The con-

tract was made pursuant to the permission granted in the Workmen's Compensation Act and in conformity therewith; consequently the act itself becomes a part of the contract, and the contract must be *construed in the light of the true intent and purpose of the act.*" (Italics ours.)

"It would seem that the framers of our act had a broader vision than that which had inspired previous acts; a vision which embraced the idea of restoration of capacity of that unit of industry made up of labor, *regardless of the cause of its breakdown, . . .*" (Italics ours).

There is more language in the opinion to the same effect but the net result is that the court held that the framers of the Workmen's Compensation Act intended that these hospital contracts which were provided for and permitted under the act should protect the employee against loss through disability even though not caused by his employment and that such protection should not be limited to disability resulting from a pathological condition.

Our attention has not been called to any case in which this concept has been extended to health and accident insurance policies.

The converse of the factual situation before us was considered in *Chase* v. *Business Men's Assur. Co. of America,* 51 F.2d 34. There the policy insured against loss caused by *sickness or* bodily *injuries.* The insured died from typhoid fever. The policy provided for a death benefit if the death resulted from "bodily injuries effected solely through accidental means."

The beneficiary (widow) contended that "the introduction of typhoid bacilli by insured into his system was accidental in the sense that it was unintentional and that an infectious disease, such as typhoid fever, injures the body, . . ."

The court rejected this contention, stating: "In the ordinary sense of the words ["bodily injuries"], we do not regard the contracting of an infectious disease, through the normal consumption of food, air or water infected with the bacilli which causes such disease, as the suffering of bodily injuries from accidental means. ... In their ordinary and popular sense, the phrase 'bodily injuries' conveys the idea of a cut, a bruise or a wound rather than a physical impairment caused by disease."

The court further stated: "The rule is well settled in the national courts that contracts of insurance, like other contracts, should be construed according to the sense and mean-

ing of the terms which the parties have used, and that those terms ought to be taken, understood and given effect in their *plain, ordinary and popular sense,* ... [citing numerous authorities]. It is difficult, if not impossible, to draw an *exact* line of demarcation between bodily injuries and bodily disease.'' (Italics ours.)

■ However, as the opinion emphasizes, ''the ordinary man makes a distinction between them in his common speech. And, in construing this insurance contract, we are concerned not with *scientific* definitions but with the ordinary meaning of common words.'' (Italics ours.)

We subscribe to the view expressed in *Burns* v. *Employers' Liability Assur. Corp.*, 134 Ohio St. 222 [16 N.E.2d 316, 117 A.L.R. 733], wherein the court stated: ''We do not speak of sickness as an accident or an injury. When we hear that someone has suffered an accident, we conclude that he has suffered, more or less, some external violent bodily injury. ... There would [otherwise] be no difference between an accident policy and a health policy, except insofar as it would be necessary to trace the cause in the former to some mischance.''

■ Another point should be mentioned. Appellants describe the infections, high temperatures and anemia suffered by the boy during his hospitalization as an ''illness'' within the meaning of this term as used in the policy. However, as pointed out in *Chase, supra,* such illness ''is an effect of the accident, the incidental means produced and used by the original cause, the accident, ...''

■ *Admissibility of extrinsic evidence to ''interpret'' the meaning of the policy.* In response to questions by the trial court, appellants expressly disclaimed any attempt to alter or vary the terms of the policy. Nor have appellants pleaded or raised any issue of fraud, mistake or misrepresentation. As appellants' counsel stated, ''[t]he policy speaks for itself.''

■ We have determined, as did the trial court, that there is no ambiguity or uncertainty in those provisions of the policy under consideration herein.

■ On the record as thus presented, extrinsic evidence as to the interpretation to be given these provisions is not admissible. (*Barnhart Aircraft, Inc.* v. *Preston,* 212 Cal. 19, 22 [297 P. 20]; *Lippman* v. *Sears, Roebuck & Co.,* 44 Cal.2d 136, 145 [280 P.2d 775]; *Hotchkiss* v. *Nelson R. Thomas Agency,* 96 Cal.App.2d 154, 157 [214 P.2d 568]; *El Zarape*

*etc. Factory* v. *Plant Food Corp.*, 90 Cal.App.2d 336, 344 [203 P.2d 13].)

In *El Zarape, supra,* the court stated: "Neither mistake nor fraud is claimed. The validity of the contract is not in dispute. *No ambiguity appears in the contract.* It must, therefore, be considered as containing all of the terms agreed upon by the parties, and there can be no evidence of the terms agreed to other than the contents of the writing." (Italics ours.)

Appellants rely upon *Norton* v. *Farmers Auto. Inter-Ins. Exchange,* 40 Cal.App.2d 556 [105 P.2d 136]. In this case, the specific question was whether an automobile insurance policy issued by the defendant company covered the daughter-in-law of the named assured.

The provision in the policy giving rise to the controversy provided that the company "shall not be liable for loss or damage ... (D) Caused while the said automobile is being driven or operated by any person other than the Insured or a member of his immediate family or his paid driver; unless said person, otherwise qualified hereunder, is temporarily operating said automobile with the consent of the Insured except that the extension provided for in this condition shall not be available to" a public garage, automobile repair shop, etc. (italics omitted).

The court held that the above provision *created an ambiguity* as to (1) whether, by the use of the phrase, "the *extension* provided for in this condition," it was intended by implication to extend the coverage of the policy to persons in addition to the named insured and (2) whether, if this be so, the daughter-in-law was intended to be included as a member of the insured's "immediate family."

Accordingly, the opinion holds that "the plaintiff was entitled to invoke the aid of parol evidence to explain the sense in which the ambiguous words were employed." The judgment against plaintiff was reversed because evidence as to conversation between the named insured and the company's agent relating to this issue was stricken out after having been admitted originally.

The basic distinction between *Norton* and the instant case is that the policy provisions in the former are ambiguous and uncertain, whereas those in the instant case are not. In fact, all of the cases relied upon by appellants are based upon the premise that there is an ambiguity in the policy.

Appellants complain that they "were denied the privilege of introducing evidence as to their understanding of the terms in question and conversations with the [selling] agent during negotiations for the contract." We assume that this "understanding" is based upon oral statements allegedly made by the agent to them. The record indicates no other basis.

Appellants offered to prove, by the testimony of the appellant Walter M. Callison and his wife, that the agent who sold them the policy had assured them that in the event of an *accident,* if the original treatment did not effect a cure and a six months' period elapsed and further treatment was necessary, the policy would take care of that second treatment. Respondent's objection to this offer of proof was sustained.

While appellants deny any intent to alter or reform the terms of the policy, this is exactly what is being attempted. We shall indicate in parentheses the additions to the so-called six months' provision which appellants desire to effect by the admission of parol evidence, as follows: "If, following a period for which expense is payable under this policy by reason of any one period of sickness (or of any one injury), no expense covered by this policy is incurred as a result of such sickness (or injury) for a period of six consecutive months but thereafter expenses are incurred from the same cause, such expense so incurred shall be deemed to be the result of a different sickness (or of a different injury) and compensable as a new period of sickness (or as a new injury), subject to a new Deductible Amount."

It is only by amending the policy, as indicated above, that appellants would be entitled to recover in this action. Of course, if expenses of only $3,000 had been incurred for the first hospitalization, then there would have been a balance of $2,000 remaining to be applied to the expenses of the second hospitalization.

Because the expenses incurred for the first hospitalization exceeded $5,000, the following provision in the policy became directly applicable: "In no event will payment be made in excess of the applicable Aggregate Amount Payable [$5,000] as stated in the Schedule as the result of any one accident. ..."

Whether appellants are attempting to change this provision so as to increase the amount of respondent's liability for any *one accident* or whether they are asserting that such

provision was waived by respondent's selling agent is immaterial.

The policy expressly provides as follows: "No agent has authority to change this policy or to waive any of its provisions." Appellants' offer of proof makes no reference to any authority, either actual or ostensible, of the selling agent. As stated in *Sharman* v. *Continental Ins. Co.*, 167 Cal. 117, 125 [138 P. 708, 52 L.R.A. N.S. 670]: "But Wade was merely a soliciting agent of the defendant. He had no authority, actual or ostensible, to waive conditions in the policy. This was not within the scope of any apparent authority he possessed, . . ."

There is also contained in the policy the following provision: "No change in this policy shall be valid until approved by an executive officer of the Company and unless such approval be endorsed hereon or attached hereto."

Judgment affirmed.

Shoemaker, P. J., concurred.