**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Appellant,**

v.

**Gray W. SHELTON et ux., Appellee.**

**No. 18395.**

Court of Civil Appeals of Texas, Fort Worth.

Jan. 29, 1981.

Rehearing Denied Feb. 26, 1981.

Elliott, Churchill, Hansen, Dyess & Mayfield, and Thomas G. Nash, Jr., and Joe B. Allen, III, Dallas, for appellant.

Gray, Whitten & Loveless, and Michael J. Whitten, Denton, for appellee.

OPINION

MASSEY, Chief Justice.

Plaintiff policyholders under the Major Medical and Basic Medical expense covers brought suit against the issuing company. Following a trial before the court without a jury upon an agreed statement of facts,

judgment was rendered for the policyholders and against the company for amount which was the total of the hospital and medical, etc. expenses incurred in connection with elective remedial surgery on Mrs. Gray W. Shelton. Additional amounts for penalty and attorney's fees were also awarded. From this judgment defendant Connecticut General Life Insurance Company brought its appeal.

We reverse and render a take nothing judgment.

Years ago Mrs. Shelton was married to a man by whom children were born in a state of health such that her physician advised that there would be extreme hazard to the health of any subsequent child born of the marriage. This was because of incompatibility of the Rh factor in the blood of the parents. There was no evidence of any danger to the mother; only to any child she might bear. The advice received was that any such child would probably perish. Because of this the woman, who later became Mrs. Shelton, decided that she should have tubal ligation, i. e. the operation commonly referred to as "having one's tubes tied". She did have such an operation and it was successful in that future pregnancy was thereby prevented.

Thereafter she married Shelton. She became "covered" by the policy of insurance upon which the instant suit was predicated. She and her husband desired to have a child of such marriage if that should be possible. By recourse to medical examinations and advice they learned that the state of the art of medical and surgical practice had advanced so that restoration of Mrs. Shelton's fallopian tubes to a condition that she might become pregnant was more likely to be successful than unsuccessful. Also determined was that the Rh factors in the blood of Mr. and Mrs. Shelton were compatible; that in the event of the birth of a child there should be no expectation of complication or difficulty to either such child or to the mother.

Based upon this advice Mrs. Shelton elected to have the restorative surgery. An operation was performed and it was suc-cessful. In due course she and her husband have a reasonable expectation that a healthy child might be born of their marriage.

The policy of insurance was in force and effect at the time of the restorative surgery. If and in the event it should be properly construed to cover and provide for the payment of the expenses attendant thereto the Sheltons would be entitled to collect the benefits provided. The amount of these benefits are stipulated for purposes of the appeal; if the Sheltons have entitlement to any benefits it is for those awarded them by judgment.

The sole point of error of the company is that there was "no evidence that the Plaintiffs' claims for expenses were incurred for the necessary care and treatment of an injury or sickness as defined in the group insurance contract."

We will express our opinion at the outset, to be later elaborated, that absent any language of the policy of an intent to cover operations of the character here involved—either expressed or by necessary implication,—the general principles of the law relative to insurance forbid the holding that there was liability of the company therefor as a covered risk for which insurance was afforded. We do not find any such language in the policy and therefore have no doubt but that the decision is controlled by these general principles.

We copy from provisions found in the Shelton policy. The insuring provisions, in pertinent part, under the title "Major Medical Benefits", provide as follows:

"If ... a dependent, while insured for Major Medical Benefits, incurs Covered Expenses as a result of an injury or a sickness, the Insurance Company will pay an amount determined as follows: [here the measure to be applied, not copied because immaterial under the only point of error presented]

. . . . .

"COVERED EXPENSES: The term Covered Expenses means the expenses actually incurred by or on behalf of ... de-

pendent for charges listed below, ... only to the extent that the services or supplies provided are recommended by a physician as essential for the necessary care and treatment of an injury or sickness."

The group insurance contract defines the term "injury" as follows:

"The term injury will include all injuries received by an individual in any one accident."

The group insurance contract defines the term "sickness" as follows:

"... physical sickness, mental illness, functional nervous disorder and covered pregnancy...."

From the presentation of both parties we think it not to be doubted that the test to be made of coverage by the policy of insurance is upon the premise that the operation resulted because there was election to submit thereto by reason of either "injury" or "sickness" as defined by the policy, or—if not contradictory thereto—by legal definitions to be attributed to these terms. In any event, as already stated, we do not find any policy language which would alter general principles of the law of insurance so as to express an intent of the parties to the contract that an operation of the character involved should be a covered risk.

By the history of insurance in the United States the beginning theory was that risks or the chance of loss, to be insurable, must be pure risks and should not be based on a moral hazard. In addition to be insurable the risk must be measurable in quantitative terms for which purpose the law of large numbers and the theories of probability and chance are employed. The law of large numbers is based on the observation that the larger the number of instances taken, the closer the result approaches the theoretical probability, and, as applied to insurance, that means the probability of loss. Carried to the ultimate this means to have converted the probability of loss into "expectation of loss" or value of the risk. Thereby is determinable the consideration to be charged (ultimately or in advance, with—as applied to mutual companies—reasonably assured profits to be shared without out likelihood of a necessity to make a greater payment, to insure an individual or group of individuals. Noticed is that in the case of a stock company the individual insured is generally not entitled to share in the company's profits; but at the same time he is not expected to pay more in the event there should be a loss and not a profit for the term insured.)

In addition to the requirement that risks, to be insurable, must be of the pure variety as described above, and must also lend themselves to measurement in quantitative terms, certain other conditions must be met before the institution of insurance may function. (1) The risk must be genuine, must exist for large groups of people, and its existence must be recognized by a sufficient number of people to warrant the establishment of organization(s) to insure it. (2) Persons exposed to the risk must feel a responsibility for the possible loss and its consequences. (3) Those concerned (in the instance of mutual insurance) must possess the resources with which to pay their pro-rata share of the costs or premiums. (4) The magnitude of the potential loss must be sufficient to cause a real hardship for the individuals upon whom actual losses may fall. (5) *The events concerned must be accidental or fortuitous* in character; they must occur according to the laws of chance and not be subject to control by those seeking to insure. (6) And, finally, a catastrophe hazard must not exist.

■ As we view it the matters set out in the foregoing paragraph provide a method for considering applicable limitations upon the well recognized rule that in the construction of insurance contracts the terms and provisions are to be considered to afford insurance whenever no violence is done by giving them meaning and effect in accomplishing to the fullest extent the intention of the parties as expressed by the policy.

Generally it is contemplated to be that in attaining the objective of insurance and insurability the moral hazard should not be

permitted to exist. The simplest example of such a moral hazard is that applicable to fire insurance on property; as applied thereto the moral hazard is the risk or probability that the individual insured will destroy or permit to be destroyed the insured property for purpose of collecting insurance benefits. There has been qualification of this principle in insurance policies, perhaps in those related to health insurance more than in any others. In many of such policies are found provisions for payment of insurance benefits indemnifying the insured for costs incidental to pregnancy and childbirth. However, these benefits of insurance are payable because of their inclusion by contractual provision. They are not payable otherwise—assuming normalcy of the term of pregnancy and absence of complications attendant thereto or to ensuing childbirth.

In its brief the company has included a good many citations of cases exemplifying application of basic insurance principles; where in each the result has been the holding that there was no liability under various policies of insurance. We list these:

*McGregor v. General Acc. Fire and Life Assur. Corporation*, 214 N.C. 201, 198 S.E. 641 (N.C.1938) (holding that impacted wisdom teeth which caused no trouble, pain or illness prior to their removal did not constitute a disease).

*Myers v. Metropolitan Life Insurance Company*, 152 Pa.Super. 507, 33 A.2d 253 (1943) (holding that a congenital eye defect was not a disease, i. e., not an illness, malady or disorder).

*Beaudoin v. La Societe St. Jean Baptiste De Bienfaisance De Biddeford, et al.*, 116 Me. 428, 102 A. 234 (1917) (holding that a broken leg was not a sickness; there was no accidental bodily injury coverage).

*Fazekas v. Perth Amboy Holy Mary Roman Catholic Sick Ben. Soc.*, 13 N.J.Misc. 822, 181 A. 631 (1935) (holding that a broken elbow was not a sickness; there was no accidental bodily injury coverage).

*Callison v. Continental Casualty Company*, 221 Cal.App.2d 363, 34 Cal.Rptr. 444 (Cal.App., 1963) (holding that burns were not a sickness and disallowing additional benefits in the policy for sickness where the coverage limits for injury had been exhausted).

*Diez v. Accident Indemnity Insurance Company*, 162 So.2d 206 (La.App., 1964) (holding absence of liability of the company for expenses attendant to claims for benefits under "sickness" provisions of the insurance policy to pay for children's tonsillectomies—because the surgical procedures were purely preventative, or in other words elective, and not done in treatment of a sickness).

*Reserve Life Insurance Company v. Whitten*, 38 Ala.App. 455, 88 So.2d 573 (Ala.App., 1956) (holding that where a tubal ligation had been performed on the insured to prevent future pregnancy shown to be dangerous to the insured in the event it should occur there was not coverage under a sickness policy for medical expenses, the operation not having been performed to relieve any existing condition).

*Fullerton v. General Motors Corporation, etc.*, 46 A.D.2d 251, 362 N.Y.Supp.2d 581 (1974) (holding, in an instance where there was a claim for disability under the New York Workmen's Compensation Law for time lost due to an elective bilateral tubal ligation, there was no liability of the company for the insurance benefits of the policy because it was conceded by the claimant that the surgery was performed solely at her request because she desired sterilization. The applicable statute defined disability as "inability of an employee to perform the regular duties of his employment as the result of injury or sickness").

We view the objectives of the surgical procedures in this case, as applied to the insurance afforded by the policy, to be the same as would have been existent had Mrs. Shelton been well able to become pregnant and bear a child, but desired for reasons other than the security of existent health in her own person to "have her tubes tied". In either case the procedure would be elective surgery unrelated to sickness or

accident. (We assume absence of any complication following surgical procedures.)

■ The event, the surgical procedure, though undoubtedly necessitating hospital and medical expense and a period of physical disability for a period to follow, was neither accidental or fortuitous in character, nor was it necessitated to cure or alleviate any condition of sickness of Mrs. Shelton. While we recognize that she would have greatly preferred to be in physical condition so that she might become pregnant without necessity of the operation, yet, from the standpoint of the company the moral hazard which should not be permitted to exist under basic insurance principles would have application to any claim for benefits predicated upon the expense attendant to and incident to the accomplishment of the elective surgery.

■ We reject the resourceful argument of the Shelton's attorney that the evidence raised the issue of "sickness" in Mrs. Shelton by reason of the earlier operation, so that the corrective surgery was made necessary. We deem that in this case it would be a distortion of the terms "unsound", "impaired", "morbid condition of the body which hinders and prevents the organs from normally discharging their functions", etc., to force the company to afford insurance by its policy.

We reverse the judgment of the trial court and render judgment that Gray W. Shelton, et ux., take nothing by the suit against Connecticut General Life Insurance Company.

SPURLOCK, J., dissents.

SPURLOCK, Justice, dissenting.

The group health insurance contract in question defines "sickness" as "physical sickness, mental illness, functional nervous disorder and Covered Pregnancy." I will limit my dissent to the discussion of the term "physical sickness" in an attempt to demonstrate why Mae Janell Shelton's condition falls within this category.

A small percentage of the women in our population are born with an Rh negative factor in their blood. That by itself presents no problem. However, as the bulk of the population is Rh positive a woman with a Rh negative factor runs the risk of marrying and conceiving children with a man whose blood type is Rh positive and thus incompatible with hers. Again, the husband's blood, should it be Rh positive is incompatible in the situational sense only, that situation being the conceiving and the giving of birth to children. Even at this point the first child is usually "a freebie". During the first pregnancy, assuming it to be normal, the newborn's blood does not mix with the mother's until birth. If the child's blood is Rh positive, as mathematics dictate it usually will be, at the point of mixing the child's incompatible blood with the mother's, the mother's body responds as if it were being invaded by an "antigen", a substance perceived by her body as deleterious to it. This triggers the mother's body to produce antibodies specifically tailored to destroy the invading antigen; in this case, the baby's blood. As her body is not so alerted until the birth of the first child the complications that arise affect only subsequent pregnancies. During the course of any future pregnancies the mother's system, now alerted to the antigens (the Rh positive blood of the fetus) "attacks" the fetus' blood supply with antibodies. Normally her system does what is intended; the fetus dies and the mother miscarries.

To avoid the continuous and recurring possibility of this gruesome scene our plaintiff, a woman born (and borne) with an Rh negative factor "chose" to become sterilized. It is this capacity to choose that has singled her out to be denied coverage. People normally don't choose to become physically ill. In line with the majority opinion it is this inability to choose that allows for insurable risks. There exists that element of chance, a chance that the group as a pool seeks to insure against.

Mrs. Shelton is perceived as having denied chance by having chosen to receive elective surgery. What the insurance company and the majority fail to realize is that the ailment for which Mrs. Shelton seeks

redress is not the undoing of the tubal ligation but the condition that made it necessary in the first place. For Mrs. Shelton, despite the limits of the English language, did not "choose" to become physically sick. The term choice as it is normally applied to elective surgery has no significance here. It would be far more accurate to depict Mrs. Shelton's situation, when she "chose" to have a tubal ligation sixteen years ago as one in which she was *forced* to *trade* one illness for another. She may have had some input as to what effect her condition would *impose on her body* (inability to conceive as opposed to the inability to bear children.) But Mae Shelton did not choose to be sick; she merely chose from limited possibilities what form that sickness would take. It was chance that made her sick, chance that created her Rh negative and chance that exposed her to the perilous environment of conceiving children with a male that was Rh positive. In this regard Mae Shelton was no better and no worse than anybody else born with a susceptibility to a particular disease.

To argue that surgery to avoid the complications arising from her Rh negative factor was elective is preposterous. To argue further that the inability to produce healthy, live born children does not somehow demonstrate a serious impairment in a female body borders on the far reaches of common sense. A primary ability of a healthy, normally functioning female is the ability to successfully bear children. The fact that Mae Shelton, as previously married and without a tubal ligation, would have birthed still-born children or miscarried indicates a deficiency in an otherwise normal female.

The majority would have us believe that such a deficiency manifests itself only on the fetus; that the mother's health is in no way affected. Are we to presume that the ability to give birth to healthy, alive children is not the function of a healthy female? Somehow, because there temporarily and frailly exists a child to accept, unwillingly, the onus of this failure, we are expected to conclude that such a condition affects only the health of the child. As these frail souls depart into the next world we are expected to sit here content in the knowledge that the mother is a healthy and unimpaired woman. In fact it is her body that is possessed by the disease. The miscarried child exists as sad testament to this disease. Only by curing the mother can the tragedy to the child be avoided. Mae Shelton did not choose to become sterile, not in the true sense of the word. It was a decision forced upon her as she sought the lesser of two evils. Such a Hobson's choice is a choice in name only. And now she seeks to have removed a deficiency the yoke of which she had no choice but to struggle under.

Connecticut General, in its brief, cited and relied upon the following definition from *Couch on Insurance* 2d § 41:803:

" 'Disease' has been defined as an alteration in the state of the human body or some of its organs or parts interrupting or disturbing the performance of the vital functions or as a deviation from the healthy or normal condition of any of the body, and as a morbid condition of any of the functions or tissues of the body. "The words 'sickness' and 'disease' are technically synonymous, but given their popular meaning as required in construing a contract of insurance, 'sickness' is a condition interfering with one's usual activities, whereas disease may exist without such result; in other words, one is not ordinarily considered sick who performs his usual occupation, though some organ of the body may be affected, but is regarded as sick when that diseased condition has advanced far enough to incapacitate him."

The definition speaks for itself. The Rh negative factor incapacitated Mae Shelton's ability to have a normal pregnancy and childbirth. The tubal ligation in no way altered that symptom; it only allowed her a little greater freedom in her sex life. Her present operation stems from a desire to cure the illness and restore Mae Shelton to a normal state. I would affirm the lower court.

I respectfully dissent.