[Civ. No. 999. Fourth Appellate District.—February 6, 1933.]

LEO M. HARVEY, Respondent, v. G. C. DeGARMO et al., Appellants.

G. C. DeGarmo, *in pro. per.,* and W. M. Crane for Appellants.

Pacht, Pelton & Warne and Charles A. Bank for Respondent.

VAN ZANTE, J., *pro tem.*—This is an appeal by the defendants from a judgment rendered against them in the sum of $4,500 as damages for breach of certain contracts.

Plaintiff brought suit against defendants to recover damages for breach of contracts and for an accounting. The original complaint contained six causes of action, the first of which was based on a general contract, and the second, third, fourth and fifth on two specific written contracts, designated as order No. 458 and order No. 159, which were made pursuant to the general contract. The sixth cause of action was for an accounting.

At the close of the trial the plaintiff was permitted to file an amendment to his complaint. Defendants contend this is reversible error, and cite the case of *Union Lumber Co.* v. *J. W. Schouten & Co.*, 25 Cal. App. 80 [142 Pac. 910], in support of their contention. Plaintiff relies on this same case.

We find that the complaint as amended contains the same subject matter as the original complaint and in effect is only a restatement of the several causes of action contained in the original complaint. We believe the trial court committed no error in allowing plaintiff to amend his complaint and that the above-named case fully sustains the court's ruling.

Under the pleadings as amended, damages were awarded under the two specific written contracts designated as order No. 458 and order No. 159, but none were awarded under the general contract and no accounting was allowed. As the general contract forms the basis for the above-named orders it is set forth *in haec verba* as follows:

"This agreement entered between the Sunset Specialty Company, a copartnership, and Harvey Machine Company.

"For and in consideration of the mutual covenants therein contained, the parties hereto agree as follows:

"Harvey Machine Co. agrees to manufacture Ease-A-Just Brackets for Wind Deflectors for the Sunset Specialty Company at Three Dollars and Fifty Cents ($3.50) per set. Harvey Machine Co. is to furnish its own tools and dies for making said brackets for Wind Deflectors.

"Sunset Specialty Co. agrees to give the exclusive right to the Harvey Machine Co. for the manufacture of said Brackets for Wind Deflectors, during the entire duration of

their contract with Mr. Miller, by which contract the Sunset Specialty Co. holds the exclusive right to make, vend and sell said Wind Deflectors, patent for same being issued August 2nd, 1921, Patent No. 1,386,418.

"Harvey Machine Company agrees to manufacture any number of Brackets for Wind Deflectors the Sunset Specialty Company may need in the course of its business, within a reasonable time after the order has been placed.

"Harvey Machine Company agrees to replace Brackets for Wind Deflectors that are defective, free of charge. Harvey Machine Company also agrees to keep sufficient stock on hand to be able to supply at all times the needs of the Sunset Specialty Company for Brackets for Wind Deflectors.

"Harvey Machine Company agrees to protect the Sunset Specialty Company against any raise in price of said Brackets and give them any benefit that may be derived by reason of any reduction in cost of labor and material.

"It is further agreed that should the Sunset Specialty Company discontinue to use or sell any more Wind Deflector, that it will so notify, in writing, to the Harvey Machine Company and agree to take and pay for any Brackets for Wind Deflectors the Harvey Machine Company may have on hand at the time completed or in the course of construction."

Plaintiff executed the contract herein under the fictitious name of Harvey Machine Company, and defendants executed the same under the fictitious name of Sunset Specialty Company.

Pursuant to the general contract, and on the second day of September, 1924, defendants placed order No. 458 with plaintiff for 5,000 sets of brackets at $2.50 per set. This order provided that the sets were to be delivered "as wanted" and were "to be taken in full before April 1st, 1925". On the twentieth day of December, 1924, pursuant to the same general contract, defendants placed order No. 159 with plaintiff for 1,000 sets of brackets at $3 per set. This order contains the following notation: "Deliver 500 sets Jan. 1st balance 500 sets by Jan. 15th. We must have delivery by these dates and order placed accordingly." Under order No. 458, between the first day of October, 1924, and the twenty-sixth day of March, 1926, numerous deliv-

eries of sets of brackets were made, amounting in all to 1134. Under order No. 159, between the second day of January, 1925, and the sixth day of April, 1926, numerous deliveries of sets of brackets were made, amounting in all to 235. On each order the greater number of sets were delivered after the time fixed in the respective orders. It appears from the record that deliveries were generally made at the instance of the defendants, but it also appears that the plaintiff constantly urged defendants to accept deliveries, and on the twenty-sixth day of March, 1926, plaintiff made an arbitrary tender to defendants of 100 sets of brackets under each order, which the defendants refused to accept at that time, but later accepted deliveries as above indicated. The defendants contend the evidence shows an intention on the part of all the parties to modify and alter the terms of the above-named orders. Their position is probably best stated in their own words, and we quote from their opening brief as follows:

"While Orders 458 and 159, according to their written provisions, required appellants to take the brackets thereunder as specified, the evidence clearly establishes that almost immediately after these orders were signed appellants and respondent, by a mutual implied agreement and understanding, modified their terms to the extent that appellants should be bound only to take brackets as the requirements of their business should dictate. For nearly a year and a half thereafter the written provisions as to quantities and dates concerning the delivery of brackets were completely ignored by both parties, and appellants requested, and respondent delivered, brackets in absolute disregard of said written terms. This customary practice effected a cancellation and modification of the original written provisions which both parties acquiesced in, ratified and carried out, thereby fully and completely executing this parol alteration and modification, with the result that the written specifications were superseded, extinguished and became legally non-existent."

We find very little in the record to sustain defendants' position as to modification, alteration or cancellation of contract, but, on the contrary, we do find plaintiff testified as follows: "A. I called up Mr. Williams, in their employ. I called up Mr. Learock and I personally went there a

number of times and talked to them. 'Why don't they take the brackets.' 'Well, we can't use them now.' Q. Do you know, about what date did you first call attention of the defendants to their failure to take brackets as specified? A. Personally I called their attention a number of times. Q. Do you know about when? A. In November, December, and January, 1924, and continuously in 1925. It became a regular nuisance in the factory. I did not know what to do with them. I have been there almost every week asking them when they would take the brackets. . . . Q. What was discussed about the orders in issue here? A. Well, he said they are going to take them as soon as they can. Q. What did you say? A. Well, I said, 'You agreed to take them as specified in this order.' 'Well,' he says, 'I can't tell you anything about that.' " There is considerable other evidence of like import in the record.

The authorities cited by defendants do not sustain their position. The record does not show consent to rescind the contracts as contemplated by section 1689, subdivision 5, of the Civil Code, nor an executed oral agreement to alter or modify the contract as contemplated by section 1698 of the same code. The record does not disclose that the plaintiff derived any benefit nor that the defendants suffered any damage by reason of the delays in effecting deliveries of the brackets, hence there was no consideration to sustain a modification of contracts as claimed by defendants. "Obviously, the executed oral agreement, which may be proved for the purpose of altering a previous written contract, must consist in the doing or the suffering of something not required to be done or suffered by the terms of the writing." (*Mackenzie* v. *Hodgkin*, 126 Cal. 591, at page 598 [59 Pac. 36, 38, 77 Am. St. Rep. 209].) "There can be no doubt of the principle contended for by the appellant that an agreement adding to the terms of an existing agreement between the same parties, and by which new and onerous terms are imposed upon one of the parties without any compensating advantage, requires a consideration to support it; though this, of course, may consist either in a new consideration or in some favorable modification of the original contract. (Citing cases.) An executory contract may, indeed, be altered or modified by the parties. (Civ. Code, sec. 1698.) 'But . . . the variation of a contract

is as much a matter of contract as the original agreement' (*Feterman* v. *Parker,* 10 Ired. 474); and a contract for variation, equally with other contracts, requires a consideration." (*Main Street etc. Co.* v. *Los Angeles Traction Co.,* 129 Cal. 301, 305 [61 Pac. 937, 938].)

The fact that plaintiff delivered and that defendants accepted deliveries of sets of brackets for a year and a half after the dates fixed in the orders does not work a modification of contract. And even if there was an understanding, or oral agreement, that plaintiff would deliver sets of brackets when defendants wanted them, such an understanding or oral agreement would be executory. "It is well settled by an abundance of authority in this state that a written agreement may be modified by an oral agreement only when the oral agreement has been executed. (Citing cases.) According to section 1661 of the Civil Code an executed agreement is one 'the object of which is fully performed. All others are executory.' The distinction between an executory contract and an executed contract has been pointed out in *Reed* v. *Schon,* 2 Cal. App. 55, 58 [83 Pac. 77, 79], in the following language, speaking of an executed contract: 'Something which has been but is no longer a contract as defined in the Civil Code, section 1549.' The principle is well established that an agreement, in order to be executed, must be fully performed on both sides. This principle is strictly enforced when an attempt is made to set up a modification of a written contract by an oral one, under section 1698 of the Civil Code." (*Klein Norton Co.* v. *Cohen,* 107 Cal. App. 325, 330 [290 Pac. 613, 616]; see, also, 6 Cal. Jur. 27; *Pearsall* v. *Henry,* 153 Cal. 314 [95 Pac. 154, 159]; *Dean* v. *Sedan Milling Co.,* 19 Cal. App. 28 [124 Pac. 736].)

"The date when an oral agreement takes effect as altering a written contract is the date when it is executed." (*Platt* v. *Butcher,* 112 Cal. 634, 636 [44 Pac. 1060, 1061].)

"In her petition for hearing in bank her counsel calls our attention to section 1698 of the Civil Code which reads as follows: 'A contract in writing may be altered by a contract in writing or by an *executed* oral agreement, and *not otherwise.*' Under the principle of this section the plaintiff was entitled to recover interest at one per cent per month for the time during which she refused to accept,

and did not accept, interest at eight per cent per annum. She did not contract in writing to change the interest as expressed by the written terms of the note; and her acceptance of the eight per cent was of no higher dignity than an express oral agreement. But it was an *executed* agreement only as to months for which she accepted the interest at eight per cent; as to the future it was executory (citing cases) and void under said section of the code." (*Thompson* v. *Gorner*, 104 Cal. 168, 170 [37 Pac. 900, 901, 43 Am. St. Rep. 81].)

■ Defendants contend that findings as to cost of manufacturing the brackets under orders 458 and 159, and loss of profits thereon, are not supported by the evidence. We find that error was committed in computing damages as to each order. But the error was in favor of defendants, and therefore they cannot complain. "While this finding was clearly unsupported by the evidence, being in its favor, appellant cannot complain." (*Easom* v. *General Mortgage Co.*, 101 Cal. App. 186, 194 [281 Pac. 514, 517]; see, also, *Reher* v. *Reed*, 179 Cal. 235 [176 Pac. 170]; *Illinois Trust & Savings Bank* v. *Pacific Ry. Co.*, 117 Cal. 332 [49 Pac. 197]; *Epperson* v. *Cappellino*, 113 Cal. App. 473 [298 Pac. 533].)

Defendants complain that the trial court erred in awarding general damages in that the findings are not supported by the evidence. It is apparent that the evidence would warrant a larger amount in favor of plaintiff. Defendants cannot complain of such error. (*Easom* v. *General Mortgage Co.*, *supra*.) ■ They further complain that the award is improper for the reason that there is no allocation or segregation of these damages under orders 458 and 159. We know no authority requiring a trial court to allocate damages in cases of this character. "It has been held that courts may find damages in a lump sum, and that any uncertainty in the findings is to be construed so as to support the judgment rather than to defeat it." (*Erskine* v. *Marchant*, 37 Cal. App. 590, 593 [174 Pac. 74, 75].)

■ Defendants also complain that the lower court committed reversible error in applying the rule of damages. It appears from the record that plaintiff proceeded to sell the material he had acquired for manufacturing brackets for orders 458 and 159, under the provisions of sections

3051 and 3052 of the Civil Code. At the time fixed in the notice of sale no purchaser appeared and plaintiff purchased this material at what he determined to be the reasonable market value. The only testimony as to the reasonable market value of this material was given by plaintiff and is as follows: "Q. Do you know what the reasonable market value of the materials to which you referred, was, on or about that day in August on which you held the sale? A. I do. Q. And what was the reasonable market value? A. The market value of the brass was the same price as we are selling brass that we cannot use—called scrap brass, and which was left over from the orders that I was supposed to make. That was six cents a pound. And the steel, we paid for the material 5.4 cents a pound, and we allowed them four cents on it at the time we made the purchase. The screws and nuts were entirely obsolete. Couldn't be used. I still have them on hand. Can't use them unless I sell them for scrap again. Q. Were the prices you designated, the reasonable market value of that material as of that date? A. Yes, that is what I thought the reasonable market value is." This evidence stands uncontradicted and we believe supports the finding as to reasonable value of this material and the damages sustained by the plaintiff under section 3300 of the Civil Code. (See, also, *Cederburg* v. *Robinson,* 100 Cal. 93 [34 Pac. 625]; *Blair* v. *Brownstone Oil & Refining Co.,* 35 Cal. App. 394 [170 Pac. 160]; 17 Cor. Jur. 855.)

The judgment appealed from is affirmed.

Barnard, P. J., and Marks, J., concurred.