SULLIVAN, J.
 

 In this action brought by the seller’s assignee to recover from the buyer the balance due on the sale of two used copra expellers, the plaintiff appeals from a judgment, after a non jury trial, which, while in plaintiff’s favor, is in a reduced amount because of offsets allowed the buyer for damages for the seller’s breach of warranties.
 

 The action was brought on behalf of Edward T. Pittock, doing business as Pittock and Associates, who claimed from the buyer Paul X. Smith Corporation, under a written contract, the sum of $16,500 plus interest on an original purchase price of $24,000 for both machines. Actually the • defendant Paul X. Smith
 
 Co., Inc.
 
 appeared in said action, the parties stipulating that any judgment either against Paul X. Smith
 
 Corporation
 
 or in its favor on a counterclaim, might run
 
 *210
 
 jointly and severally against or in favor of Paul X. Smith
 
 Co., Inc.,
 
 as the ease might be. We need not be further concerned with this difference of corporate entities and will refer hereafter to the seller as Pittoek and to the buyer as Smith. By answer and counterclaim Smith denied liability for any further payment on the purchase price and interposed as a defense and a basis of counterclaim a breach of warranty on the part of Pittoek. The court in its judgment allowed the buyer as an offset against the original price, the sum of $14,500 for breach of warranties and rendered judgment in favor of the seller’s assignee for $2,000 plus interest.
 
 [1]
 

 In 1956 Smith, a San Francisco commodity broker dealing principally in copra and copra products, entered into negotiations with Pittoek, a broker and sales agent of vegetable oil equipment located in Glen Riddle, Pennsylvania, for the purchase of two copra expeliera to be shipped to the Wee Kun Coprax Industry Co. at Zamboanga, Philippine Islands. On January 10, 1956, Smith wrote to Pittoek: “Referring to your letter of January 5th to Mr. Paul Bates of our New York office regarding expeliera, I feel our people would want the T-56 thrust bearings instead of the T-53. Of course, they would want them all in good working order.
 

 “However, as I told Paul Bates yesterday before receipt of your letter, there is really no hurry because I am going to have to write them and give them indications of price and they will have to file an application for an import license. I will let you know as soon as I hear from them. ’
 
 ’
 

 In June 1956, Pittoek purchased from the Glidden Company in Buena Park, California, five used expeliera together with certain parts. Two of these expeliera are the subjects of the present controversy. Edward Pittoek personally went to the Glidden plant, inspected the machines, saw them running, and arranged to employ some of Glidden’s personnel to dismantle and remove the machines.
 

 Pittock then returned to Pennsylvania. On June 8, 1956, he wrote Smith as follows: “It was a pleasure to talk to you on the West Coast and to receive the order for the two Expeliera at Glidden’s. These machines are now being dismantled and water cooled copra shafts installed. We will ship two barrels
 
 *211
 
 from Philadelphia -which will be spaced for copra and contain the correct new lmife bars.
 

 “When you have shipping data please let us have this information with information on the ship and pier in San Pedro or Long Beach.
 

 “The two Expellers are specified as:—
 

 [1]
 
 ‘‘ Two Anderson Twin Motor Super Duo Expellers with 36" Cookers, 14" Conditioners, variable feeders, instruments, long vertical barrel, vertical motors are 30 H.P., horizontal motors 50 H.P., starters are for 440 volts. Used, uncleaned F.A.S. Port of Los Angeles $24,000.00 payable on presentation of a dock receipt. ’’
 

 Pittock then had his son Thomas Pittock go to Buena Park to mark the machines and prepare packing lists in connection with their removal. By letter dated June 21, 1956, he advised Smith that his son would be there in early July and asked Smith to “Please have details for him so we can complete this transaction while he is on the W. Coast.”
 

 Following this was a letter from Smith to Pittock on July 11, 1956, which in pertinent part stated: “Tom called me the other day from Los Angeles and said he was getting these expellers prepared.
 
 I sincerely hope, Ed, that when they do go out, they will he the same quality as the last ones we shipped in every respect.
 
 As you know, I am not a machinist and I don’t want anything to go to this party that would be at all different from what he had before. I am referring now to motors, thrust bearings, etc.” (Emphasis added.)
 

 On July 17, 1956, Thomas Pittock wrote to Smith:
 
 “Please he assured that the expellers to he shipped to your customer in Zamhoanga are in good condition, and have all the heavy duty features of copra expellers.
 
 We have installed water cooled TDV copra shafts, the barrels have been respaeed for copra and new knife bars installed. Please tell us how you wish the barrels shipped from Philadelphia.
 

 “
 

 “Arrangements have been made with a local firm to haul the machines to the pier. Please send us shipping instructions as soon as possible.” (Emphasis added.,)
 

 On September 7,1956, Smith wrote to Pittock: “We enclose herewith check for $2500.00, representing deposit on the two expellers purchased from you.
 
 This accepts your proposal of June 8th, covering the purchase of these expellers.
 
 The balance will be forwarded promptly. In the meantime, you might let
 
 *212
 
 us have your invoice in full less this deposit.” (Emphasis added.)
 

 The work of removing the expellers from their steel foundations at Glidden’s, dismantling them, placing them on skids, and crating them for shipment was done under the direction of one Bonafee, the assistant superintendent of Glidden's, and then by one Joe Trail, the maintenance foreman. Trail testified that he was given no instructions by Pittoek about inspecting the machines or to report any defects he might discover. He did not break the machines down in any manner in order to inspect them.
 

 On September 11,1956, the two expellers were delivered to a local trucking company which hauled them to dockside at Los Angeles for shipment to Manila. Clear dock receipts were issued acknowledging receipt of 44 pieces of machinery and parts with no exceptions noted as to condition. The expellers were then sent to Manila and by another vessel to Zamboanga, where they arrived on October 19, 1956.
 

 After the machinery was unloaded at Zamboanga, Wee Bin, president and general manager of the Wee Kun Coprax Industry Co., examined it at the dockside and at the mill compound. He found it in a damaged condition. Smith promptly notified Pittoek of the damage, claimed breach of warranties, and requested Pittoek’s instructions for shipping or disposal since the expellers were not acceptable. Photographs of the machinery were sent to Pittoek who at first denied responsibility and claimed that the damages resulted from rough handling of the ocean carriers, urging that Smith’s customer should make a claim against the steamship company. Subsequently, in November 1956, after examining a second group of photographs, Pittoek advised Smith that Pittoek should pay for some repair work but that certain damage to an expeller bed was not his responsibility. It is fair reading of the record that Pittoek refused to accept return of the machinery, insisted that the expellers were of good value but evinced willingness to bear certain expense in order to adjust the matter. A dispute also arose between the parties as to whether the seller had in fact furnished with the expellers motors of adequate horsepower. In August 1957, Pittoek admitted that the two motors were 40 horsepower instead of 50 horsepower as represented, accepted return of the old motors and shipped replacement motors of proper horsepower for which Smith paid Pittoek $5,000.
 

 The parties are in sharp and almost complete disagreement
 
 *213
 
 on the issue of breach of warranties. The seller’s position in brief is that the damaged condition of the machines, asserted as the basis of the breach, did not exist at the time delivery was effected at dockside in Los Angeles. The buyer’s position is that such condition of the machinery did exist at the time of delivery so that the warranties were not met.
 

 Edward Pittock, as we have already stated, went to Buena Park in June 1956 to purchase these and other used expellers. He testified that he spent a week or 10 days there checking Glidden’s linseed plant. It is clear that he had returned to Pennsylvania by June 8th when he wrote Smith. Although he saw the machines running “as much as maybe five minutes’’ he was unable to state whether or not they were processing any commodity at the time. The machines were then on steel foundations. This was three months before their removal from Glidden’s plant. The record does not disclose that he ever inspected the machines in any other way, much less caused them to be opened up for inspection.
 

 Thomas Pittock was at Buena Park in early July, about two months before delivery. He gave instructions on methods of packing and marked the various pieces of machinery but testified that he had nothing to do with its removal from the plant.
 

 Joe Trail, the maintenance foreman at the Glidden plant, testified that he was in charge of the maintenance of the expellers until Glidden stopped using the machines in June or July 1956. He stated that the machines were in good operating condition although they had not been overhauled and the interiors of them inspected since the spring of 1955. He supervised the dismantling and the crating of the expellers after the sale to Pittock. Trail testified that the expellers were not broken or cracked at the time they were delivered to the trucking company on September 11, 1956. Trail was shown certain photographs admitted in evidence, purportedly showing the damaged condition of the expellers upon arrival in Zamboanga. He admitted that some damage, as in the instance of the end of a cooker and a broken cooker shaft, could not have been observed by him without tearing down the machinery. He stated that the expeller could not operate with a broken shaft but added “it shows shiny here, like it could have been a new break....’’ Certain conditions represented by the photographs he attributed to cooking material rather than rust, and stated that even if it was rust, it would not interfere with the operation of the machine. In one picture, a cover
 
 *214
 
 plate appeared to be missing. There was also evidence that the conditioner may have been separated from its supports by burning off the bolts. He further testified that he would not have seen any damage inside the cooker of the expeller, since it would have been necessary to remove the head to inspect inside. When shown one photograph in evidence, he testified that it showed a shaft bearing “all beat up” and that there wasn’t any doubt that the bearing was “shot.” During parts of his testimony, the witness upon being shown evidence of purported damage in the photographs stated that it could be repaired without great expense or that it would not affect the operation of the expeller.
 

 Eobert Foulks, a truekdriver, called in rebuttal testified that he picked up the machinery at the Glidden plant and hauled it to the dock at Los Angeles. Upon being shown a photograph, admitted in evidence, of one piece of machinery, he stated that he observed none of the breaks on the machinery appearing in the picture, at the time he made his delivery. However, he was interested only in the general appearance of the machinery and would not have been interested in something not appearing to him to be of recent occurrence.
 

 The deposition of Wee Bin, president and general manager of the Wee Kun Company, taken in the Philippine Islands upon written interrogatories was read into evidence. Certain interrogatories were propounded in connection with the submission of photographs to the witnesses which appear to be the same as some of those eventually admitted in evidence. He testified that the condition shown in the photographs existed upon the arrival of the expellers at dockside at Zamboanga; that the machinery was very dirty and rusty; that he found cracks and wornout parts; and that the damage appeared to be old rather than of recent occurrence. Upon arrival the cooker was in one whole unit. When the Wee Kun Company opened up the cooker, they found its surface was worn out and that the shaft and bearings were broken. Its cover was also worn out. At first the company tried to make repairs because the machines were badly needed, but they were unable to do so because of absence of spare parts. Finally, one expeller was repaired in 1960 at a cost of “about U.S. $5,000.00.” He stated that “Most of the cost could be charged to parts since the labor was done in our shop and'not charged.” These costs were claimed by the witness to be supported by invoices, not produced by the deponent or by Smith at trial, which included expenditures for other expellers, and “it is very, difficult for
 
 *215
 
 us to split the invoices to submit to this deposition.” The witness further testified that the other expeller “cannot be repaired because of the body, it was seriously cracked and the gears and bearings are worn out. The Expeller that could not be repaired is in the Oil Mill Compound, it is mounted on a foundation awaiting spare parts.”
 

 It was never clearly proved at the trial whether the photographs, admitted in evidence, depicted the repairable expeller, the nonrepayable expeller or both. The trial judge inferred that they showed the machine which could
 
 not be
 
 repaired.
 
 [2]
 

 Hugh Arnold, then vice-president of Smith, testified that he went to Zamboanga in February 1957 to inspect the expellers. His testimony generally corroborated the condition of the machinery shown in the photographs introduced at the trial. He saw one sound expeller bed mounted in line with other expellers which apparently had been previously furnished by Pittock. The other parts of the equipment were outside in the yard. One of the machines was being repaired. It was the main expeller bed, corresponding to that in a photograph shown the witness, located in the yard and “not awaiting repair.” He found 40-horsepower motors instead of 50-horse-power motors. The lead-in wiring to the motors was clipped off right at the motor. The cooker was badly worn, spots in the exterior metal having worn clear through and all the exterior metal appearing to have a very thin character. On the inside the metal was worn and scored. The supporting members' of the cooker had been burned off. There was a large crack on one of the expeller beds and the “pad eyes” for the bolting of this equipment were fractured. “The impression . . . [he] got” was that the crack in the expeller bed was of “old origin.”
 

 The trial court found that the parties entered into a written agreement for the sale of the two expellers “for ultimate use” by Wee Kun; that the terms of the agreement were expressed in the six letters between the parties which we have set forth above
 
 ;
 

 [3]
 

 that the agreement was divisible as to each machine;
 
 *216
 
 that as a part of said agreement Pittoek represented and promised that the two copra expeller machines being sold to Smith were in good operating condition and that they possessed all of the heavy duty features which copra expeliere normally possess, which promise induced Smith to purchase and upon which it relied; that the two expeliere were not in good operating condition and did not possess all of the heavy duty features which copra expeliera normally possess; that Smith informed Pittoek the expeliere were for use in Wee Kun’s copra mill, relied on Pittoek’s skill and judgment that they were fit and proper for such intended use; that the machines were not fit and proper for such intended use; that Pittoek breached both express and implied warranties; that one of the expeliere was valueless; and that the reasonable and actual cost of putting the other expeller in a condition satisfying the warranties was $5,000. After offsetting damages for breach of express and implied warranties in the sum of $17,000, less an allowance to the seller of the value of a substitute motor, the court rendered judgment in favor of plaintiff in the sum of $2,000 plus interest.
 
 [4]
 

 We consider, in the following order, plaintiff’s contentions that: (1) There is insufficient evidence to support the finding of an express warranty since the two letters of June 8 and September 7 constituted the entire agreement between the parties and the other letters should have been excluded from consideration by the court, under the parol evidence rule; (2) there is insufficient evidence to support the findings of breach of warranties; (3) there is insufficient evidence to support the finding that one expeller was valueless; (4) there is insufficient evidence to support the finding that the reasonable and actual cost of putting the repairable expeller in a condition satisfying the warranties was $5,000; and (5) there is insufficient evidence to show that Smith, as distinguished from Wee Kun, was damaged.
 

 The essence of plaintiff’s first contention is that the two
 
 *217
 
 letters of June 8 and September 7 constitute the entire agreement of the parties. Obviously the objective of this argument is to preclude consideration of the other four letters as part of the agreement of the parties, particularly the letter of July 17, which in language set forth by us in italics declares the seller’s promise and warranty that the expellers “are in good condition, and have all the heavy duty features of copra expellers.”
 

 However, while the foundation of the express warranty is thus assailed, it is to be noted that no attack is made on the findings of an implied warranty of fitness for intended purpose. These latter findings alone would support the judgment.
 

 It is well settled that two or more written instruments relating to the same subject matter and executed as parts of substantially one transaction are to be construed together as one contract.
 
 (Symonds
 
 v.
 
 Sherman
 
 (1933) 219 Cal. 249, 253 [26 P.2d 293];
 
 Burnett
 
 v.
 
 Piercy
 
 (1906) 149 Cal. 178, 189 [86 P.
 
 603]; Mayers
 
 v.
 
 Loew’s, Inc.
 
 (1950) 35 Cal.2d 822, 827-828 [221 P.2d 26]
 
 ; Cadigan
 
 v.
 
 American Trust Co.
 
 (1955) 131 Cal.App.2d 780, 784, 786-787 [281 P.2d 332]; Civ. Code, §
 
 1642;
 
 see generally 12 Cal.Jur.2d, Contracts, § 123, p. 334.) The above rule is applicable not only where the writings are executed contemporaneously (e.g.,
 
 Mayers
 
 v.
 
 Loew’s, Inc., supra; Burnett
 
 v.
 
 Piercy, supra)
 
 but also where they are executed by the parties at different times, if the subsequent documents are part of the same transaction.
 
 (Body-Steffner Co.
 
 v.
 
 Flotill Products, Inc.
 
 (1944) 63 Cal.App.2d 555, 560 [147 P.2d 84];
 
 Lynch
 
 v.
 
 Bank of America
 
 (1934) 2 Cal.App.2d 214, 223 [37 P.2d 716].) In the
 
 Lynch
 
 case it was stated: “The rule that separate written documents between the same parties and relating to the same subject-matter as indicated by the language contained therein, or satisfactorily proved by the circumstances under which they were executed, are to be construed together as one transaction, has been determined by so many authorities there is no room for controversy regarding that principle. [Citations.] This rule applies even though the separate written instruments were not executed on the same date.” (P. 223.)
 

 The trial court properly concluded in the instant case that all of the six letters were written as parts of one transaction and should therefore be considered together. In our view the court might very well have reached this conclusion from an inspection of the letters themselves. All of the letters clearly relate to the same subject matter and transaction,
 
 *218
 
 namely the purchase and sale of the two expellers. No one instrument appears to be of a separate, independent or final nature, signed by both parties and thus constituting the “final and complete expression of . . . [their] agreement.” (Rest., Contracts, § 228.) Rather, all of the instruments appear to be sequential and interdependent in character, written “for the purpose of attaining a preconceived object”
 
 (Burnett
 
 v.
 
 Piercy, supra,
 
 149 Cal. 178, 189), the purchase and sale of the expellers. To select, as plaintiff urges, two letters of the series as composing the agreement of the parties, especially where other letters intervene between them, is to do violence to the expression of the parties. The thread of their thought must be pulled together, not segmented.
 

 However, conceding
 
 arguendo
 
 that an inspection of the instruments themselves leaves some question as to the foregoing conclusion, a resort to extrinsic evidence in the record dissolves any doubt and compels rejection of plaintiff’s proposal that only two of the letters (June 8 and September 7) constitute the contract. There is of course no statement in these two letters that they alone are to express the contract. Pittoek’s letter of June 8 does not state expressly or otherwise that it sets forth or confirms the understanding of the parties. In its language it neither accepts an offer to purchase nor makes an offer to sell on defined terms.
 
 [5]
 

 Nor is such letter of June 8 a complete expression of the agreement of the parties. Testimony elicited from the witness Edward Pittoek on cross-examination shows that while he was at the Glidden plant in June 1956, he telephoned from Whittier to Smith who was in San Francisco. Pittoek testified that he told Smith in such conversation that the machines would have T-56 instead of T-53 thrust bearings and “that was part of the agreement . . . [t]hat is important with copra machines.” Pittoek also told Smith in the same telephone conversation that he had seen the machines run and that “Glidden ... assured me that they were in good operating condition ...” In addition, Pittoek told Smith that some changes had to be made on the machines and that part of the necessary work had to be done in Philadelphia. He stated: “. . . I told him we would remove the barrels from these machines in California
 
 *219
 
 and ship the barrels from Philadelphia that were spaced correctly for copra and which had new barrel bars in them and knife bars.” He also explained on cross-examination that the machines had to be converted from the type used for processing flax to the type used for processing copra. It is a reasonable inference that the parties’ telephone conversation on this subject was directed to, and that Smith was principally interested in, the fact that the machines
 
 after conversion,
 
 would be in good operation for processing
 
 copra.
 

 [6]
 

 Essential to this, as we have already pointed out, were T-56 thrust bearings. Thus two terms, apparently regarded by the parties as essential, the thrust bearings and the operating condition of the machines, are not found in the two letters of June 8 and September 7, relied on by plaintiff as being the sole embodiment of the parties ’ understanding.
 

 In the light of the foregoing evidence, the trial court was justified in concluding that not all of the terms of the understanding between the parties were contained in the two letters of June 8 and September 7. The letter of January 10, from Smith to Pittock, shows that to meet the requirements of the buyer’s customer the expellers must have specified thrust bearings and must be “in good working order.” The letter of July 17 from Pittock to Smith contains statements on the operating condition of the machines after their conversion for copra processing. Both of these terms were discussed by the parties. It is clear to us that all of the letters are shown to be parts of one transaction and are to be taken together.
 
 (Cadigan
 
 v.
 
 American Trust Co., supra,
 
 131 Cal.App.2d, at pp. 783-784.) In the
 
 Cadigan
 
 case, the court said: “The terms of the contract are established by these three instruments, not by one to the exclusion of either of the others.” (131 Cal.App.2d at p. 787.) Similarly in the ease before us, the terms of the contract are established by the entire series of communications and not by just two letters to the exclusion of the remaining four.
 

 The use of extrinsic evidence to show that several written instruments were intended to constitute a single contract does not involve a violation of the parol evidence rule.
 
 *220
 

 (Torrey
 
 v.
 
 Shea
 
 (1916) 29 Cal.App. 313, 316-317 [155 P. 820];
 
 Cadigan
 
 v.
 
 American Trust Co., supra,
 
 131 Cal.App.2d 780, 782;
 
 Harm
 
 v.
 
 Frasher
 
 (1960) 181 Cal.App.2d 405, 413-414 [5 Cal.Rptr. 367].) The rule announced in the
 
 Estate of Gaines
 
 (1940) 15 Cal.2d 255, 264-265 [100 P.2d 1055], cited by plaintiff is not in conflict with the above.
 

 Plaintiff relies heavily on
 
 El Zarape Tortilla Factory, Inc.
 
 v.
 
 Plant Food Gorp.
 
 (1949) 90 Cal.App.2d 336 [203 P.2d 13], It is clearly distinguishable from the instant ease. In
 
 El
 
 Zarape, the seller delivered to the buyer a specific written ‘‘ confirmation ’ ’ of the agreement of the parties which the buyer acknowledged in writing to be “correct in every particular.” The court there had only
 
 two
 
 writings to be considered as the integration of the parties.
 
 El Zarape
 
 did not involve the problem presented in the instant case and did not call for the application of the rule, set forth by us above, that where
 
 several
 
 writings relating to the same subject matter are executed as parts of one transaction, they ‘‘ are to be taken together.” (Civ. Code, § 1642.)
 

 We turn to plaintiff’s claim that the evidence is insufficient to support the findings of breach of the express and implied warranties. This argument is asserte.d on two bases: (1) the theory that, since the sale was “F.A.S. Port of Los Angeles,” title to the expeliera passed at that point (Civ. Code, § 1739, rule 5;
 
 Meyer
 
 v.
 
 Sullivan
 
 (1919) 40 Cal.App. 723, 730 [181 P. 847]); and (2) the claim that the burden of proving breach of warranty by a seller falls on the buyer
 
 (El Zarape Tortilla Factory, Inc.
 
 v.
 
 Plant Food Corp., supra,
 
 90 Cal.App.2d 336, 347). Plaintiff argues that all the evidence shows the machines to have been in good condition at the time of delivery and that defendant’s evidence relative to their damaged condition is remote in time and place, not connected up with the time of delivery and therefore of no probative value. No substantial evidence exists in the record, so plaintiff concludes, to support the breach.
 

 We have already summarized the evidence bearing upon this issue. Wee Bin testified as to the extent of the damage, that it appeared to be old rather than of recent occurrence, that much of it could not be seen until certain parts of the machinery were opened up, that he was unable to use one machine and had to spend $5,000 to repair the other. Damage consisted of cracks, wornout surface of the cooker and a broken shaft and bearings. Arnold’s testimony was to the same effect. The trial judge had before him the various photo
 
 *221
 
 graphs to which the testimony referred. From the foregoing testimony it was reasonable for the trial judge to infer that the damage was of a type that was old; that it was unlikely to have occurred in transit, but probably resulted from long usage, wear and tear and in instances from the improper dismantling of the machines; that some of it, as for example in the case of the cooker, could not have been discovered unless the machinery was opened up; that most of it would not be ordinarily perceptible to the witnesses Trail and Foulks; and that the damage was extensive enough to render the machinery in bad condition, lacking the heavy duty features of copra expellers and unfit for the use for which it was intended. This damage, the court could reasonably conclude was of such a character and extent that it must have existed at the time of delivery at dockside. At such time therefore the goods did not conform to the contract.
 

 We proceed to consider the extent to which each expeller failed to conform to the warranties. The contract of sale, as the court properly found, was divisible as to each machine. The court found that “one of the two expeller machines . . . was valueless.” In our view, this finding is supported by the evidence. Wee Bin’s testimony, which we have set forth above, is to the effect that his company was able to repair one expeller at a cost of $5,000 but was unable to repair the other. He stated that it could not be repaired “because of the body, it was seriously cracked and the gears and bearings are worn out. ’ ’ Plaintiff makes much of the fact that the witness added: “The Expeller that could not be repaired is in the Old Mill Compound, it is mounted on a foundation,
 
 awaiting spare parts.”
 
 (Emphasis added.) The last three words, plaintiff claims, shows an intention to repair and negates a condition of valuelessness.
 

 However, the fair intendment of Wee Bin’s testimony as a whole is that one expeller was too damaged to be repaired. The court heard other evidence on the extent of its damage and had before it the several photographs showing the condition of the nonrepairable machine. The determination of factual conflicts with respect to the nonrepairable condition of one expeller, including the resolution of the ambiguous remark quoted above, was within the exclusive province of the trial court.
 
 (Berniker
 
 v.
 
 Berniker
 
 (1947) 30 Cal.2d 439, 444 [182 P.2d 557];
 
 Kuhn
 
 v.
 
 Gottfried
 
 (1951) 103 Cal.App.2d 80, 84 [229 P.2d 137].)
 

 
 *222
 
 The court also found that “ [t]he reasonable and actual cost of putting the remaining expeller machine in a condition which would satisfy the express and implied warranties was $5,000.00.” Plaintiff claims that the finding is without support on two grounds: First, the evidence as to the fact of damage is uncertain, since all the testimony and the photographs in evidence related to the expeller which could not be repaired. Secondly, the evidence does not show the reasonable cost of repairs.
 

 We think that the evidence in the record and the reasonable inferences therefrom show that both expeliera were damaged and only one of them could be repaired. Wee Bin’s statement that he found the machinery dirty and rusty and “also found some cracks and worn out parts” obviously refers to both machines. Hugh Arnold testified that when he visited Zamboanga one of the machines was being repaired. When shown the photographs in evidence, he identified some pictures as showing the nonrepairable expeller, but he stated that the main expeller bed was the only piece of equipment then in the process of repair and the other auxiliary parts were around in the general area of the yard. He referred to the pictures as showing “a mixture” of both machines. It is a reasonable inference from the foregoing that
 
 some
 
 damage existed with respect to the expeller which could be repaired and that it consisted of rusty, cracked and wornout parts. We find no uncertainty as to the fact that damage occurred. (Civ. Code, § 3301.)
 

 Wee Bin testified that the above expeller was repaired at a cost of “about TJ.S. $5,000.00.” The foregoing testimony supports the court’s finding not only in respect to “actual” cost but also in respect to “reasonable” cost. The amount actually paid for repairs is some evidence of their reasonable value.
 
 (Laubscher
 
 v.
 
 Blake
 
 (1935) 7 Cal.App.2d 376, 383 [46 P.2d 836].) Plaintiff contends that such evidence, standing alone, will not support the finding if there is any contrary evidence of reasonable cost of repairs, citing
 
 Dewhirst
 
 v.
 
 Leopold
 
 (1924) 194 Cal. 424 [229 P. 30];
 
 Bacigalupi
 
 v.
 
 Phoenix Bldg. & Constr. Co.
 
 (1910) 14 Cal.App. 632 [112 P. 892];
 
 Harvey
 
 v.
 
 DeGarmo
 
 (1933) 129 Cal.App. 487 [18 P.2d 971];
 
 Malinson
 
 v.
 
 Black
 
 (1948) 83 Cal.App.2d 375 [188 P.2d 788]. In support of this argument plaintiff argues that certain evidence elicited by the defendant from plaintiff’s witness Pittock relating to the cost of repairing damage shown in the photographs, indicated repairs for a lesser amount. This testi
 
 *223
 
 mony did not show that the expenditures as made by Wee Kun were unreasonable. Nor was there any opinion evidence to that effect. The evidence to which we are referred by plaintiff is fragmentary at best and consists of statements made in connection with some items of damage shown on the photographs that such damage could be repaired easily without much cost. No testimony was given by plaintiff’s witness as to the entire damage. Nor did the above or any other testimony of plaintiff’s witness furnish evidence of the reasonableness of repairs in the Philippine Islands. We need not determine therefore whether a rule of law as claimed by plaintiff restricts in instances the acceptance of expenditures as some evidence of reasonableness. Assuming
 
 arguendo
 
 that it does, it is apparent that there was no contrary evidence of the reasonable cost of the repairs actually made at Zamboanga. It was within the province of the trial court to accept the testimony given as to actual expenditures and to conclude that it was some evidence of reasonable value.
 

 Plaintiff urges, however, that although the damage and loss which we have described may have occurred, there is no evidence that it was suffered by Smith or that Smith was damaged in any way as result thereof. According to this argument, it was Wee Kun Company which held the damaged machinery and incurred the expense of repairing some of it. No evidence, so it is argued, shows that Wee Kun made any claim against Smith or refused to pay Smith any part of the purchase price.
 

 We find that the record supports plaintiff’s theory, underlying this argument, that the original sale was from Pittoek to Smith and that subsequently Smith resold to Wee Kun. The court’s finding as to the first sale is amply supported by the evidence. It can also be reasonably inferred from the evidence that Smith resold to Wee Kun although as we shall point out, the record furnishes no details pertaining thereto. However, we reject defendant’s answering argument that Smith made the purchase from Pittoek as Wee Kun’s agent and was therefore entitled to recover damages on behalf of Wee Kun in the instant ease. (Code Civ. Proc., § 369.)
 
 [7]
 
 The fact remains that it is Smith which answered the complaint
 
 *224
 
 and counterclaimed as the real party in interest.
 
 [8]
 
 Its allegations of damage are “deemed controverted by the opposite party.” (Code Civ. Proe., § 462.) It was incumbent upon the defendant to prove such allegations.
 

 Since therefore Smith is precluded from recovering damages for breach of warranty on its counterclaim on the theory that it appears herein as the agent of Wee Kun, we must consider whether the evidence supports a recovery of such damages by Smith in its own right. As an alternative argument, Smith claims that its right to the allowance of damages in the instant judgment is supported by the holding in
 
 Grupe
 
 v.
 
 Glick
 
 (1945) 26 Cal.2d 680, 690 [160 P.2d 832].
 

 In the
 
 Grupe
 
 ease, Click, the original seller, sold three machines to Grupe at $500 each upon the express representations that they were suitable for re-refining oil. Grupe sold each machine for $1,500 and was negotiating for the sale of five more at a price of $1,800 when it was discovered that the machines were unsuitable for the warranted purpose. The court found that the value of the machines at delivery was $75, but, if as represented would have been $4,500 and awarded general damages in the sum of $4,425. In addition the trial court allowed Grupe recovery of specific amounts expended by him and two of his vendees in attempting to make the machines conform to the warranty. In affirming the award of expenditures made by Grupe’s vendees, over the objection that it did not appear either that Grupe had paid his vendees or they had sued him for breach of warranty, the court said: “In regard to the items of $321.34, $526.50, and $600 awarded as special damages, it is generally held that, in an action against the seller for a breach of warranty of quality, the purchaser may recover damages for money and time spent in reasonable efforts to make the machine conform to the warranty under which it was sold [citations] and,
 
 in addition,
 
 where the purchaser
 
 resells the machine
 
 with a warranty similar to that made by his seller, without knowledge that the machine is unsuitable for the purpose for which it was designed, he may recover the amount for which he is liable to his subpurchaser because of the latter’s expenditure of time and money in reasonable efforts to make the machine conform to the warranty [citations], notwithstanding that
 
 *225
 
 the purchaser has not settled with the subpurchaser or suffered judgment [citations].
 

 “As it may be assumed that a buyer will spend time and money in reasonable efforts to make defective goods conform to their warranty, the amounts incurred or paid for that purpose should be considered as being within the contemplation of the parties at the time of the original contract of sale and, because such damages proximately result from the breach of warranty and can be ascertained with reasonable certainty, they are allowable. With respect to the expenditures of the subpurchaser in reasonable efforts to cure the breach of warranty, there can be no valid objection to their inclusion in the award upon the ground of lack of proximity or certainty and as Glick knew that Grupe was purchasing the oil re-refining machines for resale, such damages reasonably may be considered as a foreseeable consequence of the breach of warranty. Accordingly, the trial court properly allowed Grupe $321.34 which it was shown he expended in good faith in his efforts to enable his vendees to use the machines. Also, the amounts of $526.50 and $600, paid by subpurchasers Fred McTyr and Ben C. Shepherd, respectively, in connection with their efforts to operate and successfully use the oil re-refining machines were correctly charged to Glick in the findings and judgment.”
 
 (Grupe
 
 v.
 
 Glick, supra,
 
 26 Cal.2d at pp. 689-691. Emphasis added.)
 

 While the record is devoid of evidence as to the terms of the resale made by Smith to Wee Kun, it may be reasonably inferred therefrom that Smith knew the purpose for which Wee Kun would use the expellers, namely in Wee Kun’s copra processing business. It is also reasonable to infer from the evidence that Wee Kun was relying on Smith’s skill and judgment in obtaining the machines. Thus the evidence is susceptible of the inference that the resale to Wee Kun was subject to the same implied warranty of fitness for purpose that the court found to obtain in the original sale from Pittoek to Smith. (Civ. Code, § 1735, subd. (1).)
 

 Applying the above rule announced in
 
 Grupe
 
 v.
 
 Glick, supra,
 
 to the foregoing evidence and reasonable inferences therefrom, we are of the opinion the sum of $5,000 spent by Wee Kun in making the expeller which could be repaired, conform to the warranty, was properly allowed to Smith as an offset against the purchase price.
 

 With respect to the nonrepayable expeller, Smith was entitled to recover “the difference between the value of the
 
 *226
 
 goods at the time of delivery to the buyer and the value they would have had if they had answered to the warranty. ’ ’ (Civ. Code, § 1789, subd. (7).) The court allowed Smith an offsetting amount of $12,000. Since it found that this expeller was valueless at the time of delivery, it is implicit in the findings that the court found it would have had a value of $12,000 if it had answered the warranty. This was of course its purchase price which is not disputed by plaintiff. Accordingly the allowance to Smith of the sum of $12,000 as damages for breach of warranties in respect to this expeller was proper.
 

 The judgment is affirmed.
 

 Bray, P. J., and Tobriner, J., concurred.
 

 [1]
 

 Tlie amount of the judgment is $2,603.52 representing the balance of §2,000 plus §605.52 interest from September 7, 1956, to date of judgment. In accordance with the above stipulation, judgment is against both Smith corporations.
 

 [2]
 

 The trial judge felt this was a reasonable inference and one which favored the seller “because if that is a picture of the machine which could be repaired, then the other machine was in at least as bad and probably a worse condition than that in the picture; so I can’t see that you are harmed in any way. ’ ’
 

 [3]
 

 The court ordered “stricken all evidence, oral and documentary tending to establish the agreement between the parties ...” except said six letters.
 

 [4]
 

 The amount of the judgment was calculated on the following formula:
 

 [5]
 

 It is to be noted that the selection of the two letters of June 8 and September 7 is largely adventitious and dependent upon the order of introducing evidence. Had the position of the litigants been reversed or the posture of the case different, e.g. a fully paid purchase price, the opening selection and emphasis would have been on the six letters.
 

 [6]
 

 The negotiations for the expellers had been conducted personally by Paul Smith, president of the corporation, who was dead at the time of the trial. The usual avenues of extrinsic evidence to show the circumstances under which the several letters were written and the terms of their agreement were not open to defendant which had to obtain such evidence on cross-examination of the opposing party. (Cf.
 
 Cadigan
 
 v.
 
 American Trust Co., supra,
 
 131 Cal.App.2d 780.)
 

 [7]
 

 The trial court refused to adopt Smith’s proposed counterfindings that the “contract was made for the benefit of said. Wee Kun Coprax Industry Co., Inc. by Paul X. Smith Corporation as
 
 agent
 
 thereof” and that “in purchasing the two expeliera from Pittoek, Smith acted as the
 
 agent
 
 of Wee Kun....” (Emphasis added.)
 

 [8]
 

 In its counterclaim defendant alleged it "was required to cause to be expended the sum of §5,000.00 in placing one of the Expeliera in good operating condition. The remaining Bxpeller was worthless and beyond repair. ’
 
 ‘